Wilson vs. Noonan.

## WILSON VS. NOONAN.

LIBEL. (1, 2) *Malicious intent no part of the issue.* (3) *May be proven to enhance damages.* (4) *Express and implied malice.* (5–8) *Disproof of implied malice.* (9–12) *Pleading and proof as to mitigating circum stances; how far absence of malicious intent may be shown under gen eral denial.*

EVIDENCE. (13) *How far testimony in a bill of exceptions admissible on sub sequent trial.*

REVERSAL OF JUDGMENT. (14) *For rejecting evidence when its purpose was not stated.* (15) *For refusing defective instruction.*

1. If one, in a communication not privileged, publish words *untruly* charging another with a crime, he is liable to the person so charged for any damage actually sustained by the latter in consequence of such publication (including compensation for injury to the feelings, or mental suffering, as well as actual pecuniary loss); and this though the publication was made without any bad motive or malicious in tent.

2. Except in the case of certain privileged communications, therefore, malicious intent is no part of the issue in slander or libel, but only a circumstance in aggravation of damages.

3. *It seems* that the plaintiff, without any specific allegation of the facts to be proved, may introduce evidence of malice over and above that to be implied from the publication itself, for the sole purpose of enhanc ing the damages.

4. Malice in law, or *implied* malice, and malice in fact, or *express* malice, are phrases which do not properly denote different kinds of malice, but merely different kinds of *evidence;* the malice being inferred in the one case from the mere fact of publication, and in the other case established by proof of other facts.

5. The bad intent or malice which is implied in law from the fact that defendant published a false and injurious charge, is as much the sub ject of disproof or refutation as would be the malice sometimes called express.

VOL. XXXV—21

6. Where words published were calculated on their face to convey the impression that plaintiff had been influenced by bribery in his official action as a state senator, and are therefore held libellous, and defendant liable therefor, at least in *compensatory* damages, evidence is still admissible (as by the direct testimony of the defendant himself) to show that the publication was not made with any bad motive or malicious intent; and such evidence is to be considered by the jury in connection with the question of *punitory* damages.

7. The former decision in this cause (27 Wis., 610, 611), so far as it seems to hold the contrary of the three foregoing propositions, overruled.

8. Where, however, the court had correctly held that the published words complained of, charged the plaintiff with being influenced in his official conduct by bribery, the defendant could not be heard to testify in his own behalf, *that he did not intend by or in such publication to make such charge* against the plaintiff.

9. Under our statutes (R. S., ch. 125, sec. 27), *it seems* that in slander and libel, mitigating circumstances cannot, in general, be given in evidence under the general denial, but must be specially pleaded.

10. But it has been held (22 Wis., 372), that in slander evidence of plaintiff's bad character in respect to the particular crime charged by the alleged defamatory words, is admissible under a general denial; and the decision is approved.

11. *Direct* evidence to disprove the existence of any bad motive or malicious intent (as the testimony of the defendant himself denying that he had any such intent), is admissible under the *general denial.*

12. But if collateral facts or circumstances are relied on to disprove such motive or intent, they must be specially pleaded under the statute.

13. The bill of exceptions in a cause, purporting to contain all the testimony given at the trial, is competent evidence, and the *best* evidence, to show what testimony was given; and after the death of a witness, his testimony, as preserved in such bill of exceptions, may be read at a subsequent trial of the cause, as evidence of *the facts* therein stated.

14. Where the form of the questions put to a witness, or the terms in which an offer of evidence is made, are such as naturally lead the court trying the cause to regard the evidence as designed for an improper purpose, the legitimate purpose for which it is sought to be introduced must be indicated to the court by the party seeking to introduce it, or its rejection will not be treated, on appeal, as fatal error.

15. Instructions requested must be without fault, to render the refusal of them fatal error; and where the form of an instruction asked by the appellant was such that it might have confused the jury as to the true rule of damages in the cause, this court declines to reverse the judgment for a refusal of such instruction.

APPEAL from the Circuit Court for *Milwaukee* County.

Action for libel. The complaint, after some prefatory matter, alleges that on or about the 18th of March, 1866, during the session of the legislature of this state for that year, the defendant, at the city and county of Milwaukee, did maliciously publish and cause to be published, in the German language, in a newspaper printed and published in said city, called the "Banner and Volksfreund," of and concerning the plaintiff, and of and concerning his official action as a member of the state senate, certain false, scandalous and defamatory matter. The alleged libelous article (signed "Argus") is then set out in German, and an English translation given, which is alleged to be correct. The article (as translated) stated that the writer understood from reliable sources that Mr. Wilder, the manager of the Milwaukee & Minnesota Railroad, had been authorized by the president of the Pennsylvania Railroad and others to purchase the right of way alongside the St. Paul Railroad, from Portage to La Crosse, and, as soon as authority to do so could be obtained from the legislature, to build another track, which should be completed by the first day of January then next, or by the opening of navigation in the spring of 1867. It then eulogized the Milwaukee & Minnesota Railroad Company, and pointed out the great advantages which must accrue to Milwaukee from the possession of two competing lines between that city and La Crosse. "And yet," it added, "this company, which comes here with these enlarged and encouraging business plans, encounters at the very threshold a most vigorous opposition from the Jenny Lind Club and its train of venal mercenaries and bought-up hangers-on, who pretend to be the special friends and guardians of our city. At the head of this crusade stands Alexander Mitchell," etc. The following sentences, here given in full, contain the words chiefly relied upon in this action : "But that which is most remarkable is, that both senators from this county, Messrs. Larkin and *Wilson*, — the senator from Washington county, Mr. Thorp, —

the senator from the eastern part of *Dodge* county, Sat. Clark, and the senator from La Crosse and Monroe, Mr. Chandler, oppose with all their might all the liberal enterprises of this new company, and do everything in their power to hinder the construction of a competing railroad line from Milwaukee to La Crosse. To those who know that Alexander Mitchell is rich and unscrupulous, the reason why this is so need be no great secret. But it is a matter for the people who are misrepresented by those faithless senators to become enraged and apply a remedy. That money has been used to effect some of these railroad laws, we know. We have names, amounts and dates, so that there can be no mistake. How long shall the best interests of our city and our state be trifled with, and our citizens be misrepresented, by faithless and selfish senators? This is a question we propose here to consider. San Francisco delivered California from a shameful state of things by a vigilance committee. We are opposed to mob law and mob violence, but there are occasions when the people owe it to themselves to speak with firmness and decision, though not with violence. It is possible that such a crisis is upon us. Let our people consider it, and see how long it is wisdom to sit still and allow themselves to be sold, and our best interests to be betrayed."

It is further averred in the complaint that a large proportion of the people of this state are Germans, who still speak and read the German language, and among whom the said newspaper has an extensive circulation, and that this is particularly true in respect to the constituents of the plaintiff in his senatorial district; and there is an allegation in the usual form as to damages.

A demurrer to the complaint as not stating a cause of action, was overruled, and the ruling was affirmed on appeal to this court, which held that the words complained of charged plaintiff in his capacity as a state senator with having been induced by pecuniary considerations to betray his public trust,

and were *prima facie* libelous. 23 Wis., 105. The defendant then answered.

His answer contained a general denial, together with an averment of circumstances attending the publication of the article in question, to the effect that defendant was at that time a resident of the senate district represented by the plaintiff ; that the plaintiff, in speaking, voting and using his influence in the senate to prevent the passage of a certain bill relating to railroad matters (referred to, by way of inducement, in the complaint), had acted in disregard of the opinions which his constituents, at the time of his election, understood and believed him to entertain, and " in violation of the petitions of his constituents ; " and that " the said alleged libel or publication was a fair and warrantable criticism of the official conduct of the plaintiff as .a representative of said senate district, and not as imputing or intending to impute any crime of bribery or fraud on the part of the plaintiff as a member of the senate." It is further alleged, in substance, that a similar bill was pending in the state senate in the session of 1865, plaintiff being then also a member of the senate, and that soon after the adjournment of the legislature that year, defendant received information which he then and still believed, showing that five senators, of whom the plaintiff was not one, had received $500 each, from a fund sent out to Madison by parties interested in defeating such bill. For a second defense it is alleged, in substance, that at the session of the legislature in 1863, plaintiff, as a member of the senate, corruptly agreed to attend to the passage of a bill incorporating the Wisconsin Copper Mining and Smelting Company upon condition that he should receive a certificate of the capital stock of said company of the value of $50, and afterwards, in pursuance of such agreement, did receive such stock ; and that these facts became known to defendant prior to January, 1866, " whereby the personal and official reputation and character of the plaintiff became and was at the times last aforesaid greatly injured, and was of no value ; and that all the facts herein be-,

fore stated were well known to the people of said plaintiff's
senate district, and to the people of said state."

Upon the first trial of the issues so made, the plaintiff had
a verdict and judgment.    On appeal to this court, most of the
rulings of the circuit court to which exceptions had been taken,
were sustained ; but the judgment was reversed for error in re-
jecting certain evidence offered by the defendant as to plaint-
iff's " official character and reputation as a representative."    27
Wis., 598, 611–12.

On the second trial (in November, 1871), Moritz Schœffler tes-
tified for the plaintiff, that the " Banner and Volksfreund " had
been published in Milwaukee as a newspaper in the German lan-
guage, since 1844 ; that he (Schœffler) had during all that time
been the proprietor and chief editor ; that he employed one Ar-
ban as a translator from English into German, for said paper, for
about eighteen years, such employment having been terminated
by the death of Mr. Arban, in 1871, after the former trial of this
action ; that the defendant, during a number of years prior
to and including 1866, occasionally wrote in English arti-
cles on subjects of public interest, and sent them down to
Schœffler's office, which were translated by Mr. Arban and
published in said paper ; that on the 12th of March, 1866, wit-
ness found on his table an article in the English language in
defendant's writing, but without signature ; that witness at-
tached the name " Argus " to it, and sent it up to Mr. Arban,
who translated it into German, and such translation was insert-
ed in said paper on the next day, and was the same set forth in
the German language in the complaint ; that he had no specific
directions from defendant in regard to the article, nor was there
any express agreement between them as to such articles, but
he treated it just as defendant's other articles were treated ;
that shortly afterwards witness was notified by an attorney-at-
law for the plaintiff that an action would be commenced against
him for the publication of said article, unless he would disclose
the name of the author ; that he informed defendant of this

threat, and defendant authorized him to tell plaintiff's attorney that he (defendant) wrote the article, and also promised to protect witness from any damage, or "see him out of it;" that witness reported these facts to plaintiff's attorney, and also published an article in his paper retracting, so far as he (witness) was concerned, the charges or intimations against plaintiff found in said article; that the original article in defendant's handwriting had been taken to defendant's office by defendant himself, or some one in his behalf, and had apparently never been returned to the " Banner " office.

Dr. F. Huebschmann, for plaintiff, testified in substance that he read the article in the "Banner and Volksfreund" the morning of its publication; that he saw defendant at the office of the latter the same day, and remarked that said article was " rather strong," or " very strong," and that defendant in reply made remarks, the precise terms of which the witness could not distinctly recall, but the purport of which he thought was, that defendant thought he " could prove it "— " that enough had leaked out," from a certain person named, " to prove it." On his cross examination, the witness said that defendant might have used the word " justify " instead of " prove." He further testified that this conversation related to the article as published, but that he thought defendant did not read German.

Proof was also made of the circulation of the " Banner and Volksfreund" among the Germans of this state, and especially in the senate district represented by the plaintiff. It was also shown that the English translation given in the complaint was substantially an accurate translation of the article as published in German.

None of the witnesses examined for the plaintiff on this trial had read the original English article written by defendant; and a part of the testimony as to the identity of the German article set forth in the complaint with that published in the " Banner and Volksfreund," and as to the correctness of

the English translation found in the complaint, was objected to on that ground, but the objection was overruled. It was shown by the testimony of plaintiff's witnesses, that on the former trial of this action, Mr. Arban was examined as a witness in plaintiff's behalf, and cross-examined at length; and plaintiff was permitted, against objection, to introduce the bill of exceptions made on the former appeal, as evidence of what Mr. Arban's testimony was, and as evidence of the facts testified to by him. Said bill of exceptions was certified to contain *all* the evidence given upon said trial. The substance of Mr. Arban's testimony on the examination in chief (as found in said bill of exceptions) was, that he translated the article in defendant's handwriting, sent up to him as above described, and that the translation was substantially correct. It appears that a copy of the original English article, written by defendant, was in the court upon said trial, and was put into the hands of the witness. On his cross examination, it appeared that instead of the words, " that money has been used to effect *some of these railroad laws*, we know," the original contained the words, " that money has been used to effect *past railroad legislation*, we know ;" that instead of the words, " venal mercenaries and bought-up hangers-on," the original contained the words, " snobs and purchased supporters;" and that instead of, " it is *a matter for the* people, who are misrepresented by *those* faithless senators, to *become enraged* and apply a remedy," the original had, "it is *for our* people, who are misrepresented by *their* faithless senators, to *seek out* and apply a remedy." The bill of exceptions also shows that said witness was in several instances requested by defendant's counsel to give a German translation of certain expressions in said copy of the original English article, and that he gave such translations, but these oral German translations so given are not preserved in said record. Defendant now moved to strike out all of Mr. Arban's testimony, upon the grounds, first, that it appeared from said bill of exceptions that it did not contain all the testimony

given by said witness on the former trial; and, secondly, that the paper to which he testified, and which formed part of his testimony (viz., said copy of the defendant's original article), was not now present. The motion was denied. The English translation found in the complaint was offered in evidence. It was objected to by defendant, on the ground that there was no proof that the German article, as published, was the article written by defendant, or that defendant had ever authorized its publication; but the objection was overruled.

A motion for a nonsuit was denied. Defendant was then examined as a witness in his own behalf, and testified that in March, 1866, he wrote an article and sent it to the "Banner and Volksfreund," or took it himself, and that he did not write any other article for that paper, at about that time; that he thought that, as he was going that way, he took the article himself to the Banner office, and went in for the purpose of seeing Mr. Schoeffler, but did not find him in, and left the article on his table, but gave no directions in regard to it; that he was dissatisfied with plaintiff's course in regard to the "Through Train Bill," so called, which was a bill to enable the Milwaukee and Minnesota Railroad Company, upon certain conditions, to run trains over the western division of the La Crosse & Milwaukee Railroad, and also in regard to a bill pending at the same time for the building of a road from Portage to La Crosse, to be operated in connection with the road of the above named company from Milwaukee to Portage City; that he (defendant) and the people of the senatorial district represented by plaintiff were deeply interested in the success of these measures, and their wishes had been expressed through petitions, public meetings, and instructions to plaintiff; that at the time witness wrote said article, it was the general impression in plaintiff's district, that plaintiff, contrary to the wishes of his constituents, was opposing said bill at Madison "all he knew how;" and that witness had been so advised by parties interested in the measure, who had been at Madison. He further testified that he

could not read the German language, and had not read the published article in question, nor had he been advised as to what it contained until after the commencement of this action; that he remembered the conversation with Dr. Huebschmann above mentioned; that he did not tell Dr. H. that he could prove that plaintiff had been bribed. In reply to several questions as to what was said in that conversation, the witness made the following statements: "I stated to Dr. Huebschmann that I had sufficient information, or sufficient information had come to me, to satisfy me that everything I intended to say in the article left in the 'Banner' office could be substantiated, or was true. The Dr. said that he had read a pretty strong article in the 'Banner,' and I remarked to him that, so far as I knew anything about it, the statements in it, from information I had, were correct; that the article was true. He said he did not believe that *Wilson* was a corrupt man ; and I told him I did not think he was. He stated that he thought *Mr. Wilson* had got into bad company, that he was misrepresenting his constituents ; and the idea was (without pretending to give the language), that circumstances had got him to go against his own convictions, * * but he did not think he would take a bribe, or be induced to. I told him, in substance, that I did not think he would either, but others had done it, I had reason to believe, in the legislature the year before." Several questions were put to this witness, which the court overruled, as follows: After he had testified to having written an article and sent it to the "Banner and Volksfreund" in March, 1866 (the article here in question), he was asked to "state the circumstances under which that article was written;" but the evidence was objected to as incompetent, irrelevant and immaterial, and the objection was sustained. Q. "In that article that you wrote, did you refer to some pending legislation?" Objected to, "because the article will speak for itself;" and objection sustained. Q. "Did you in that article, charge or intend to charge *Mr. Wilson*, or any other person, with being bribed to their action

in that pending legislation?" Objected to, on the grounds that the writing must be produced, that the article itself was the best evidence of what the writer charged or intended to charge therein, and that this was matter of construction for the court. Objection sustained. Q. "Do you know, and did you know previous to the publication of this article, what *Mr. Wilson's* views and opinions were upon that bill?" Objected to as irrelevant and immaterial, and ruled out. Q. "Do you know why it was that these public meetings were held and instructions passed to *Mr. Wilson* on that subject?" Q. "About the time the article referred to was taken to the printing office, had you any knowledge or information in reference to the passage of previous railroad bills before the legislature?" Objected to as incompetent, irrelevant and immaterial; and ruled out. Q. "Had you any knowledge or information that money had been used to effect previous railroad legislation, at the time or about the time this article was written?" Objected to on the same grounds as the two previous questions; and ruled out. Q. "State whether, in the article you wrote on the subject of the 'Through Train Bill,' in referring to previous legislation that had been influenced by money, you had any reference whatever to *Mr. Wilson.*" Objected to on the grounds, 1. That the article which defendant wrote was the best evidence to prove whether the writer had any reference therein to *Mr. Wilson.* 2. That whether defendant had any such reference in the article must be determined by the court upon the language of the article itself. 3. That the question propounded to the witness had been finally adjudicated by the supreme court adversely to defendant. Objection sustained. Q. "State whether, at the time, you believed or intended to say that *Mr. Wilson* had been influenced in his action in that railroad legislation by money." Objected to on substantially the same grounds as the previous question; and also on the ground that the testimony was not admissible under *the pleadings*, and that defendant must be conclusively presumed to have intended what the article itself

charges, and was not at liberty to deny the malice implied from the falsity of the charge, and that the absence of express malice could be shown only by proof of collateral facts and circumstances stated in the answer, and not by the opinion or declaration of any witness that the writer did not intend what the language clearly imports. Objection sustained. Q. "State whether you did in that article charge *Mr. Wilson,* or intend to charge him, with being induced by pecuniary considerations to betray his public trust in his capacity as a senator." Objected to on grounds similar to those above stated. Defendant's counsel then said: "We propose to show that whatever the article may say, defendant did not intend to say that." The objection was sustained.

Joseph Phillips, for the defendant, testified that he was a member of the legislature in 1866, from the city of Milwaukee; that while the "Through Train Bill" was pending before the legislature, the people of said city, and especially those of the district represented by him and the senatorial district represented by plaintiff, felt a deep interest in said bill, which was manifested through the papers and by public meetings after the fact became known that *Mr. Wilson* was opposed to its passage. Q. "State what *Mr. Wilson's* action on that bill was." Objected to as incompetent, irrelevant and immaterial, and ruled out. Defendant then offered to prove by the witness that *Mr. Wilson* opposed by all means in his power the passage of the bill, but finally voted for it, stating that if it were necessary, to defeat it, he would vote against it, notwithstanding the instructions of his constituents. Objected to as incompetent, irrelevant and immaterial, and ruled out. Dr. Huebschmann was then called for defendant, and an offer was made to prove by him that at a public meeting in Milwaukee in February, 1866, at which plaintiff was present, a resolution was passed instructing plaintiff and other members of the legislature from Milwaukee to use all rightful means to effect the passage of the "Through

Train Bill;" but the offer was rejected as incompetent, irrelevant and immaterial.

No evidence was offered to sustain the *second* defense.

The court, in charging the jury, alluded to the fact that at the time of the publication complained of, "there was some railroad corporation endeavoring to obtain some legislation to enable them to construct an additional railroad from Milwaukee to La Crosse," and it added : "Whether the defendant or this community was in favor of this bill; whether the bill was meritorious or otherwise; whether it had friends or opponents; or whether plaintiff, as senator, was in favor of or opposed to such legislation, is of no consequence in this suit." The court further charged that, under the pleadings and evidence, the only questions for the jury were, whether defendant published or caused to be published in the "Banner and Volksfreund" the article alleged in the complaint, and, if so, what damages plaintiff was entitled to recover; that if they found any fact affirmatively showing that there was no malice in fact, they might consider it in mitigation of damages; that the supreme court had already decided in this case that the article in question was *prima facie* libelous, and charged plaintiff with having acted corruptly in his capacity as a state senator, and therefore the article could not be considered as a proper criticism on plaintiff's official action; that, the article being thus libelous on its face, the law implies malice in the writer, and will not permit defendant to say that he did not intend what the libel says. The court further charged that "if A. writes an article for publication in a paper in a different language from that in which the article is written, and takes it to the editor or pub. lisher of such paper to be by him translated for A. and to be published, A. makes such person his agent in that matter, and is responsible for such substantive translation and publication. And if defendant took the article in question to the editor of the 'Banner and Volksfreund' to be translated and published, and after the publication admitted the authorship and assumed

the responsibility for such publication, then plaintiff has made out the the affirmative of his case; and in such case it is altogether immaterial whether the original was correctly translated or not." These instructions were all excepted to by defendant. The court further charged that if defendant caused the article in question to be published in manner and form as stated in the complaint, the jury were at liberty to judge from the article itself whether this was done with willful intent to injure plaintiff's character, and if they so found they might assess such damages as they saw proper under all the circumstances of the case, not exceeding the amount claimed in the complaint; that the publisher of a libel is entitled at the common law to the same strictness of proof as is required upon an indictment, and plaintiff must prove his case beyond a reasonable doubt: and that if defendant did not publish or cause to be published the article as stated in the complaint, and did not after such publication admit the authorship and assume the responsibility for it, then they must find him not guilty. At defendant's request the court further instructed the jury that the question of the composition of the libel was wholly immaterial, except in so far as it might throw light upon the question whether defendant procured the publication thereof; and that the libel, if any, appeared to have been composed in English, and plaintiff must prove that whatever was published in the "Banner and Volksfreund" was published by defendant's direction and procurement.

The following, among other instructions asked for by defendant, were refused: 2. That if defendant wrote and published the article in question, but did so without the intention of thereby injuring or defaming the plaintiff, that fact must be taken into consideration in mitigation of damages. 3. That if the publication was libelous, the law implied what is denominated malice in law; but it was the duty of the jury to consider any facts in the case tending to show that the publication was made with good motives; and if they found it was made

by defendant, but was made with the intention of influencing the action of plaintiff and other representatives in favor of a measure of public interest which defendant believed to be beneficial to the city of Milwaukee, and did not have its foundation in a depraved and malignant intention to injure and defame the plaintiff, then the verdict should not include damages for express malice, and those facts should be considered in mitigation of damages. 5. That if the publication in question was authorized by defendant, and its leading idea was in favor of a competing line of rival railroad from Milwaukee to La Crosse, and if defendant in such publication earnestly advocated such rival railroad, or the passage of a bill by the legislature authorizing it, and in his zeal, having in view such object, overstepped the bounds of his legal rights in advocating such competing road, but without any intention to injure the plaintiff and without any express malice towards him, " then the law, from the publication, implies malice sufficient to sustain this action, at least for nominal damages; and if that is the only malice the jury find, it will not warrant them in finding punitive, vindictive or exemplary damages against defendant, but only such actual damages as plaintiff has sustained." 6. That if the article was written or published by defendant, or by his direction, they might give more or less damages according to their conclusion from the whole case respecting the motives with which it was written or published by defendant; and that they were at liberty to determine the motives with which the publication was made, from the article itself, and from the other facts in the case bearing upon that question. 9. That if defendant wrote in English an article for publication in said newspaper, and for the purpose of having the same translated into German, he was not responsible for any errors in the translation, and plaintiff must show that the article was properly translated. 10. That it was for the jury to determine from the evidence to what defendant alluded in his conversations with Huebschmann and Schœffler, " whether to

the article in English or to the one as translated and published in the Banner."

Verdict for the plaintiff, assessing his damages at $3,000; new trial denied; and defendant appealed from a judgment on the verdict.

*Palmer, Hooker & Pitkin*, for appellant, contended that the court erred in permitting the testimony of Arban to be read from the bill of exceptions made on the former trial; that, to entitle the testimony of a deceased witness given at a former trial of the action to be read, it is necessary to prove not only the substance of what he testified, but the language in which such testimony was given, substantially and in all material respects (*Comm. v. Richards*, 18 Pick., 434; *Warren v. Nichols*, 6 Met., 261; *Wilbur v. Selden*, 6 Cow., 162, 164, 165; 1 Phil. Ev., 230, 231; C. & H.'s Notes to Phil. Ev., Part 1, pp. 578, 580, note 442; *U. S. v. Wood*, 3 Wash. C. C., 440, 441); that all such witness testified, whether on direct or cross examination, must be proved (*Warren v. Nichols, supra*); that in this case it was not shown by any witness that Arban testified to what was contained in and read from the bill of exceptions; that there was no proof that such bill contained all of Arban's testimony, the statute and rules of court not requiring a bill of exceptions to contain all of the evidence (Laws of 1860, ch. 264, sec. 42; C. C. Rules of 1854, No. 30), and the certificate of the judge, stating that this bill contained all the testimony, not being evidence of what occurred on the trial (1 C. & H.'s Notes, 579; *Miles v. O'Hara*, 4 Bin., 108, 110–112); that the record shows on its face that a part of the evidence given by Arban is not contained therein; that the circuit court of Milwaukee county is provided by law with a stenographic reporter, who is an officer of the court, and whose duty it is to report the testimony in all cases ; and that the person who reported the testimony of Mr. Arban on the former trial was still living and still reporter of said court, and his testimony, with the original minutes of the examination, was the best evidence as

to what Arban testified, and the bill of exceptions was at most only secondary evidence. 2. That, excluding Arban's testimony, there was no legal proof that the German article published in the "Banner and Volksfreund" was a correct translation of the article written by the defendant, and, therefore, nothing to make defendant responsible for such published article; that the only principle on which a man can be rendered liable for the wrongful acts of another, is, that such a relation exists between them that the former, whether called principal or master, is bound to control the conduct of the latter, whether he be agent or servant (HARRIS, J., in *Blackwell v. Wiswall*, 14 How. Pr., 257, 259); that no relation of principal and agent or master and servant existed between defendant and Schoeffler, or between defendant and Arban; that Schoeffler could exercise his own judgment and discretion as to publishing what defendant wrote, and was not in any manner subject to defendant's control; and that the only translation which could have been contemplated by defendant was a correct translation, and if the article as written was not libelous, but was made so by the interpolation of words expressing what defendant never meant to express, defendant could not be held responsible for it. *Harding v. Greening*, 8 Taunt., 42; *S. C.*, 1 Moore, 447, and 4 E. C. L., 32, cited in Chitty's Pl., 405.; *Bell v. Byrne*, 13 East, 554; PARKE, J., in *McPherson v. Daniels*, 10 Barn. & Cress., 263 (21 |E. C. L., 74); *Cook v. Cox*, 3 Maule & S., 113; *Miller v. Miller*, 8 ;Johns., 75; *Fox v. Vanderbeck*, 5 Cow., 513, 515; 2 Phil. Ev., 236, and cases there cited; *Olmsted v. Miller*, 1 Wend., 506. 3. That the court erred in refusing to allow defendant to state whether in the article written by him he charged or intended to charge plaintiff or any other person with being bribed in his action relative to the legislation then pending, (1.) Because proof that the article as written by defendant contained no such charge, was competent and material to show that he did not compose or publish the alleged libelous article which actually appeared in the papers, and upon which

the action was based. (2.) Because any fact which tended to disprove malice in making the publication was admissible in mitigation of damages. Townshend, § 403, and authorities cited in note 218. Where the law allows parties to be examined as witnesses in their own behalf, the direct testimony of the witness in such an action as to the *fact* of malice should be admitted. Townshend, §§ 83–87. 4. That the court erred also in excluding the questions put to defendant as a witness, propounded for the purpose of showing the circumstances under which defendant wrote the article left by him at the Banner office, and which tended directly or indirectly to prove that it was written in the interest of the public, and for the promotion of what the defendant deemed a great public good, and without any intention of injuring the plaintiff. 5. That the court erred in its charge to the jury in withdrawing from their consideration all the facts relative to the railroad legislation referred to in the alleged libel. Those facts were a legitimate subject of consideration in determining defendant's motives, and the extent of the punishment, if any, to which he should be subjected. 6. That the court erred further in refusing to give instructions asked by defendant, the substance of which was that the intention with which the article in question was written should be considered in determining the amount of damages. Townshend, p. 79, § 88, and notes 81, 82; *Krom v. Schoonmaker*, 3 Barb., 647–650; *Genet v. Mitchell*, 7 Johns., 120–131; Sedgw. on Dam., 38, 454, 455, and cases cited.

*Geo. B. Smith*, on the same side, argued that in actions of this nature, the damages may be (1), *merely nominal* (*Flint v. Clark*, 13 Conn., 361); or (2), *compensatory* (*Armstrong v. Pierson*, 8 Clarke, Iowa, 29); or (3), *punitory*, vindictive or exemplary; that it is an entire misapprehension to suppose (as is frequently done), that in slander and libel suits, if any damages are recoverable, the jury are at liberty to award exemplary damages; that such damages can properly be given only on the ground of *malice;* that there are almost infinite degrees of malice, and

the damages ought to be proportioned to the degree of malice appearing from all the facts of the case; that courts universally recognize the distinction between what is called malice in law or implied malice, which is the malice that the law infers from the libel itself, and malice in fact or express malice, which is shown by other proof to have been defendant's motive in uttering the libel (Townshend, § 87); that they also universally recognize the fact that when the unlawful act has been done with a good motive, or not with a bad motive, the damages are to be confined, if not strictly to compensation, at least to a much smaller amount than when the libel has been uttered with a depraved intent, to gratify a feeling of hatred or ill-will towards the person injured (*Kennedy v. Holborn*, 16 Wis., 547; *Ranger v. Goodrich*, 17 id., 78; *Powers v. Presgrove*, 38 Miss. (9 George), 227; *True v. Plumley*, 36 Me., 466; *Abrams v. Smith*, 8 Blackf., 95; *Erwin v. Sumrow*, 1 Hawks, N. C., 472; *Haywood v. Foster*, 16 Ohio, 88; *Detroit Free Press Co. v. McArthur*, 16 Mich., 447; *Hotchkiss v. Porter*, 30 Conn., 414; *Symonds v. Carter*, 32 N. H., 458; *Fry v. Bennett*, 28 N. Y., 324); that the plaintiff in such a case, in opening his case to the jury, and before any attempt by defendant at a justification, may prove actual malice in order to enhance the damages (*Symonds v. Carter* and *Fry v. Bennett, supra*); and if so, then defendant, even if the admits he libel, must be at liberty to disprove malice in fact, in order to mitigate the damages; and that the court therefore erred in this case in excluding the evidence offered of circumstances tending to show an absence of malice in fact. 2. To the point that where the parties are competent witnesses, defendant should be allowed to testify directly as to his motive or intent, the counsel cited *Seymour v. Wilson*, 14 N. Y., 567; *Forbes v. Waller*, 25 id., 430; *Edwards v. Currier*, 43 Me., 474.

*A. C. Fraser*, for respondent, contended, among other things, that the only object for which the testimony of Arban, as preserved in the bill of exceptions, was offered, was to show the accuracy of the translation of defendant's article into German,

made by the witness; that the best or primary evidence of the correctness of the translation would be the *viva voce* testimony of the person who made the translation; that where such person is dead, the bill of exceptions, settled and signed by the judge before whom the cause was tried, which becomes a part of the record in the cause, imports absolute verity, and is conclusive *against the parties* as to the facts contained therein; that where such record is shown to contain all the evidence, it is the best evidence attainable as to the testimony of the deceased witness (*Baylor v. Smithers*, 1 Mon., 6, 7; *Neilson v. Columbia Ins. Co.*, 1 Johns., 301, 304); and that, although the statute and rules of court do not require the bill of exceptions in all cases to contain all the testimony, yet where the bill itself contains the judge's certificate that it does contain all the testimony, this is at least *prima facie* evidence of the fact; that the only purpose for which the paper, claimed to be a copy of the original article in English, was put into Mr. Arban's hands on the former trial, was to enable the witness, by comparison, to ascertain and point out the differences, if any, between such paper and the published German article; that the witness made the comparison, and gave the court and jury in detail the result thereof, and these differences thus pointed out are fully exhibited in the bill of exceptions, and no particle of the evidence submitted to the jury on such trial was lost to defendant on the last trial by reason of the nonproduction of the paper in question; that the oral German translations given by the witness must be presumed to have been unintelligible to the jury; that the bill of exceptions shows all the English words read from such paper document, and the corresponding words in the English translation of the German article, and this was all there was in the nature of evidence to the jury of alleged inaccuracies in the published German translation; and that it is well settled, at least in this country, that in proving the testimony of a deceased witness on a former trial, it is not necessary to give his precise words, but it is sufficient to prove their substance.

1 Greenl. Ev., § 165; 1 Phil. Ev. (4th Am. ed.), note 115, p. 397; *Pegram v. Isabell*, 2 Hen. & Munf., 193; *Caton v. Lenox*, 5 Rand., 31, 39; *Cornell v. Green*, 10 Serg. & R., 14, 17; *Wolf v. Wyeth*, 11 id., 149, 150, 151; *Watson v. Gilday*, id., 337, 338, 342; *Ballinger v. Barnes*, 3 Dev., 460; *Wagers v. Dickey*, 17 Ohio, 439, 442; *Emery v. Fowler*, 39 Me., 326, 333; *Young v. Dearborn*, 2 Foster, 372, 378; *Davis v. State*, 17 Ala., 354, 357; *Clealand v. Huie*, 18 id., 343, 346; *Kendrick v. State*, 10 Humph., 479, 491; *Rhine v. Robinson*, 27 Pa. St., 30, 35; *Clark v. Vorce*, 15 Wend., 193, 194.

Counsel further argued that even if the bill of exceptions was improperly admitted, the error was immaterial, it being clear upon all the evidence that defendant was legally responsible for the publication of the German article, even if it was not a correct translation.

2. As to the rejection of evidence offered by defendant, counsel argued that facts and circumstances in mitigation of damages must be averred in the answer, except that plaintiff's bad character for integrity and moral worth, or his reputation in respect to the particular crime or misconduct charged, may be shown, to diminish damages, under a general denial (*Bush v. Prosser*, 11 N. Y., 347, 353; *Bisbey v. Shaw*, 12 id., 67, 73; *Wachter v. Quenzer*, 29 id., 547, 551; *B—— v. I——*, 22 Wis., 372, 375; *Wilson v. Noonan*, 27 id., 598); and such facts and circumstances cannot be given in evidence unless it be distinctly stated that it is with that view and for that purpose only that they are introduced (*Fry v. Bennett*, 5 Sandf., 54, 71; *Matthews v. Beach*, id., 256, 264; *Ayres v. Covill*, 18 Barb., 260; *Hager v. Tibbits*, 2 Abb. Pr., N. S., 97, 102); that no fact or circumstance was specifically set forth in the answer, or offered to be proved at the trial, which had any tendency to rebut the inference of malice, or which could be deemed *mitigatory* in any sense of that word sanctioned by courts (Townshend, §§ 409 et seq.; *Gorton v. Keeler*, 51 Barb., 475, 480); and that a judgment will not be reversed for a re-

fusal to allow a question to be put to a witness, unless the offer was distinctly made in such a manner as to enable the presiding judge to see the materiality of the evidence under the issue formed. *Daniels v. Patterson*, 3 N. Y., 47, 51; *Chapman v. Brooks*, 31 id., 75, 88; *Pratt v. Strong*, 3 Keyes, 53, 54; *Savage v. Drake*, 8 Wis., 272, 274; *Dreher v. Town of Fitchburg*, 22 id., 675, 680.

3. Counsel further argued that when the manifest tendency of a publication is to subject the person therein mentioned to public odium, the law presumes the charge to be injurious and false; and except in cases of what are recognized as privileged communications, malice is *implied*, and, for the mere purpose of supporting the action, *conclusively implied*, from the falsity of the charge (*Fry v. Bennett*, 5 Sandf., 54, 62; *Buddington v. Davis*, 6 How., 401, 403; *Littlejohn v. Greeley*, 13 Abb. Pr., 41; *Root v. Lowndes*, 6 Hill, 518; *Washburn v. Cooke*, 3 Denio, 110, 112; *Howard v. Sexton*, 4 N. Y., 157, 160; *Lewis v. Chapman*, 16 id., 369, 372); that the law presumes in such a case that defendant *intended* just what his language imports, and will not tolerate him in averring that he did not mean it (*Fry v. Bennett, supra; Gorton v. Keeler*, 51 Barb., 475, 483; 2 Greenl. Ev., §§ 418, 425); that the terms malice in law or implied malice. and malice in fact or express malice, do not, it would seem, express different kinds of malice, but merely different methods of proof (*Darry v. The People*, 10 N. Y., 120, 136; *Bush v. Prosser*, 11 id., 347, 358; *Lewis v. Chapman*, 16 id., 369, 372; *Viele v. Gray*, 18 How. Pr., 550, 566); that plaintiff, for the purpose of enhancing the damages, is permitted to give positive evidence to strengthen and verify the legal presumption of malice, the distinction being not necessarily in the intensity of the malevolent feeling, but in the strength of the proof by which it is established (*Fry v. Bennett*, 5 Sandf., 54, 63; *Lewis v. Chapman*, 16 N. Y., 369, 372; *Fry v. Bennett*, 28 id., 324, 327; *True v. Plumley*, 36 Me., 466, 483; *Jellison v. Goodwin*, 43 id., 287, 289; *Viele v. Gray*, 18 How. Pr., 550, 566; 2 Greenl. Ev., § 418); and that in like

manner the law permits defendant to rebut the presumption of. malice, not so as wholly to defeat the action, but only for the purpose of *mitigating* the damages ; and that wherever *malice* is an element in the controversy (as it always must be in libel and slander, either as being essential to the action or as an element in the adjustment of damages), the jury may give vindictive or exemplary damages. Sedgwick on Dam., 39 ; *Tillotson v. Cheetham*, 3 Johns., 55, 58, 63 ; *Taylor v. Church*, 8 N. Y., 452, 461 ; *Hunt v. Bennett*, 19 id., 173, 174, 179 ; *Millard v. Brown*, 35 id., 297, 300 ; *Cramer v. Noonan*, 4 Wis., 231, 240.

Counsel further contended that all the instructions asked by defendant and refused, were so framed as to be inconsistent with the foregoing principles, or with former decisions of this court in the present action.

The following opinion was filed at the June term, 1872.

DIXON, C. J. In *Neilson v. Columbian Ins. Co.*, 1 Johns., 301, the defendants offered in evidence the *case* made on the former motion for a new trial, corrected before the judge, in order to contrast the testimony of .the plaintiff's two principal witnesses, delivered on the first trial, with their depositions read at the second, and thereby to lessen their credibility. The case was admitted, and, on motion for a new trial, the supreme court said : " The admission of the case made on a former trial, as evidence to show what the witnesses then swore, in order to *discredit* them at the second trial, was improper. The case is not evidence upon oath. It may have been made up by consent, and the points in contradiction may not have been particularly attended to by the judge before whom it was corrected. *The case is conclusive against the parties as to the facts contained in it,* but not against third persons, whose veracity or credit is called in question."

In *Baylor v. Smithers*, 1 Monroe, 6, the cause had formerly been before the supreme court, and a judgment which had been previously recovered by Smithers, was there reversed, and

the cause remanded to the court below for a new trial of the issue made up by the parties. Upon return of the cause to that court, and on trial of the issue, and after the witnesses whose evidence had been introduced on the previous trial, were examined, Baylor offered in evidence the bill of exceptions taken on the former trial, containing a statement of the evidence then given by the witnesses, for the purpose of impeaching their testimony; but, on objections taken by Smithers, the bill of exceptions, and the statements of the evidence therein contained, were excluded by the court. It was held on error, first, *arguendo*, that a bill of exceptions, taken on a former trial, is not competent on a subsequent trial of the same suit, to prove the facts in issue, *unless the attendance of the witness cannot be procured;* and second, that a bill of exceptions so taken is competent on a subsequent trial of the same cause, to prove what a witness, examined on both, swore on the first, to discredit him. Upon the latter point the court said: " The statements contained in a bill of exceptions must be supposed to have undergone, not only the inspection of each party or their counsel, but, moreover, the scrutiny and supervision of the court by whom the exceptions are signed. When enrolled, those statements in fact compose part of the record, and are entitled to as much verity, and are deserving of as much credit, as would be the testimony of any witness who might prove what the witness whose statements are contained in the record, proved on a previous trial; and no rule is better settled, and none more frequently acted upon, than that which allows evidence of what a witness has previously sworn or said, to impeach or discredit his testimony."

And in *Mead v. Walker*, 20 Wis., 519, it was decided by this court, that a bill of exceptions settled on an appeal from an order remains a part of the record for all purposes. The language of the opinion by Mr. Justice DOWNER, is as follows; " A bill of exceptions, once signed by the judge and filed, becomes a part of the record, and so remains *for all purposes*. And

the same is true, though there may be several of them in the course of proceedings in the cause."

We have stated the foregoing cases with some accuracy and completeness, making extracts from the opinions showing the views of the courts, because they are the only adjudications to which we have been referred, or of which we have knowledge, bearing or supposed to bear with any considerable directness upon the admissibility of the bill of exceptions settled upon the former trial of this cause, which was offered and received in evidence on the last trial for the purpose of showing what the deceased witness Arban had sworn on the previous one, and also as evidence competent to be considered by the jury in proof of the facts themselves to which the deceased witness had formerly testified. It will be seen, from the statements and extracts, that none of the cases are precisely in point, although they all assert principles consistent with the admissibility, and even justifying and sustaining it. The New York decision, which excluded the *case* for the purpose of discrediting the witness, yet held that it was conclusive *against the parties* as to the facts contained in it. The court of Kentucky decided differently upon the point of discrediting, and gave to the bill of exceptions the same full and absolute verity and conclusiveness ascribed by law to any record of judicial proceedings, and the same as was given to it by the language of this court above quoted. To prove what the testimony of a deceased witness, orally given on the trial of a case, was, the rule is, of course, that the highest and best evidence should be required. Persons who were present and heard his testimony, and remember what it was, have been held competent to testify on the subject. Is the bill of exceptions, taken and settled on such trial, and purporting to contain *all* the testimony given upon it, copied and extended from the minutes of a short-hand reporter who is supposed to catch and take down every word, competent to be received and read for the same purpose? Judging from our own experience, and from what we think has

been and is the experience of all lawyers and judges, we must say that the bill of exceptions is the highest and best evidence in such case, and that in the nature of things there can be no other of equal or superior credit or reliability. The mistakes and forgetfulness, nay, even the falsehoods and prevarications, of living witnesses are of too frequent occurrence and famil-iarity. The record made up from the lips of the deceased witness, with the full knowledge and assent of the parties, of their attorneys and counsel, and of the court, tells the same tale for all time. It is and must be regarded as the very best evidence, unless impeached for fraud in the making, forgery, or something of the kind. It is, in the language of the above authorities, conclusive between the parties, importing verity of the facts it contains; and if not, in the words made emphatic by Mr. Justice DOWNER, their record *for all purposes*, we certainly think it is for the purpose of establishing what a deceased witness's testimony was, in a case like this.

The other exceptions, numerously taken and urged by counsel for the defendant, excepting such as are deemed to have been well taken, must be dismissed with the single observation that we discover no error in the proceedings upon which they are founded, for which we think they or any of them should be sustained. Some of them were ruled and settled when the case was here on the former appeal (27 Wis., 598); and time forbids that we should now enter into any discussion of the others.

The code provides that in an action for libel or slander, "the defendant may in his answer allege both the truth of the matter charged as defamatory, and any mitigating circumstances, to reduce the amount of damages; and whether he prove the justification or not, he may give in evidence the mitigating circumstances." R. S., ch. 125, sec. 27; 2 Tay. Stats., 1444, § 29. The answer of the defendant consists of a general denial of each and every allegation of the complaint, and also a statement of some facts intended to operate as circumstances

of mitigation; but it does not aver as one of those facts that the defendant *was not actuated by malicious motives.* On the trial, and on examination of the defendant as a witness in his own behalf, he was asked the following question: "Did you, in that article, charge, or intend to charge, *Mr. Wilson* or any other person with being bribed to their action in that pending legislation?" The question was objected to by counsel for the plaintiff, and the objection sustained by the court, and the testimony excluded; to which the defendant by his counsel excepted. Some other questions were likewise put to the same witness, the object of which was to show a justifiable motive, or what the defendant so considered, or the absence of malice, in making the publication. They were in like manner objected to and excluded, and the points reserved for the opinion of this court, by exceptions taken on the part of the defendant.

The exceptions thus taken give rise to two questions: first, whether the testimony thus offered to disprove malice was admissible under the general denial; and second, whether it was competent for the defendant, under the circumstances, to testify to the absence of malicious intent in his own mind at the time of publication.

Upon the first, the inquiry would seem to be, whether malice inferred from the libelous character of the publication can be rebutted or disproven without alleging the want of it, as a mitigating circumstance, in the answer. It has been held in some well considered cases under the common law system of pleading and practice, that proof of facts and circumstances rebutting malice and mitigating damages may be made under the plea of the general issue. *Huson v. Dale*, 19 Mich., 17 (2 Am. R., 66); *Jarnigan v. Fleming*, 43 Miss., 710 (5 Am. R., 514, 521).

But the provision of the code above quoted seems to contemplate that any mitigating circumstances relied upon by the defendant should be alleged in his answer. The necessity, or at least the great propriety, in most instances, of requiring the

mitigating circumstances to be set up in the answer, in order that the plaintiff may be informed of their nature and be prepared to meet them, will become apparent upon a moment's reflection. If the reader will turn to the case of *Kennedy v. Holborn*, 16 Wis., 457, he will there see how needful it was or might have been to the plaintiff in that action, that she should have been apprised of the mitigating circumstances relied upon by the defendant, and which were set up in his answer; and numberless other cases, likely to arise and equally illustrative of the necessity and propriety of the rule, can readily be imagined. We are not prepared to hold, therefore, as a general proposition, that mitigating circumstances may be given in evidence under the general denial. The statute seems to forbid it, and by that we must be governed.

But in *B—— v. I——*, 22 Wis., 372, in slander, this court held that evidence of the plaintiff's bad character, before the words alleged were uttered, in respect to the particular crime or fault charged, was admissible under a general denial. The reason assigned was, that the plaintiff could not have been benefited by a statement in the answer that evidence of bad reputation for chastity would be relied on in mitigation of damages. The plaintiff was presumed to have come into court prepared to meet any attack upon her general character in that particular. The defamatory words complained of imputed to her fornication and other grossly licentious conduct; and as she came into court relying upon her previous good character in that respect, and probably averring it, as is usual in complaints of the kind, the opposite, or her bad character, was considered fairly within the issue formed by the general denial.

In the complaint before us the averment is, that the defendant did "maliciously publish and cause to be published the false, scandalous and defamatory matter complained of." A proper construction of the pleadings might require it to be held, perhaps, that an issue upon the question of malice was thus raised by the general denial.

But we prefer to put our decision upon a somewhat different ground, which is, that where the purpose is to disprove malice (by which we mean bad or wicked motive or intent) by direct evidence, as by the testimony of the party himself, showing or tending to show the nonexistence of the fact, there the absence of malice, thus proved, or offered to be, as a mitigating circumstance, need not be pleaded otherwise than by the general denial. It could hardly be of any practical benefit or advantage to the plaintiff in such a case, to require the defendant, after he has answered by general denial, to answer furthermore that he denies all malice, and will offer direct evidence in support thereof on the trial. So far as wicked motive or bad intent is or may be relied upon as a ground for enhancing the damages against the defendant, so far the defendant may meet and rebut the fact by direct evidence to the contrary, without special allegation in his answer; though, if collateral facts and circumstances be relied upon to show the absence of such motive or intent, they must be pleaded. Such seems to be the fair and reasonable interpretation of the statute, and the meaning which must be ascribed to the words "mitigating circumstances," as used in it.

And this view seems greatly strengthened when we come to consider that malice or bad intent is not an essential element of the wrong of which the plaintiff complains; not a fact which he must establish in order to entitle himself to verdict and judgment against the defendant in the action. To this rule there is exception in but a single class of cases, those of privileged communications, where malice, or, as it is sometimes termed, express malice, must be averred and proved. In certain communications denominated privileged, namely, those which are made in the course of judicial proceedings, and some others of a public nature, there exists absolute immunity from liability on the part of the speaker or writer. See *Larkin v. Noonan*, 19 Wis., 82, and authorities cited. In all other actions for libel and slander, malicious intent constitutes no part of the issue,

but is or may be considered only as a circumstance in aggregation of damages. Actual damages, that is, compensation for injury to the reputation and injury to the feelings, or for mental sufferings, so far as the same can be measured in money, to which may be added also any actual pecuniary loss, in proper cases or where that ensues, may always be recovered, regardless of the intent or conception of mind with which the publication was made, or words spoken, or whether such intent was good or bad at the time in the writer or speaker. If A. *untruly* says of B. that he is a thief, in a communication not privileged, then, no matter that A. may say so under circumstances which induce him truly and sincerely to believe that B. is a thief, and which show he is actuated by no bad motive or evil design to injure B., yet he is bound to make reparation to B. for such loss or damage as B. actually sustains.

The views thus expressed respecting the nature of the action, and that malice is not a necessary ingredient of the wrong complained of, are the same advocated by that most discerning and accomplished writer, Mr. Townshend, in his treatise on the wrongs called slander and libel, and on the remedy by civil action for those wrongs. Townshend on Slander and Libel, §§ 82 to 92, inclusive, and notes. With his usual philosophical insight and just and accurate appreciation of the principles involved, the author has made this, like many other points discussed by him, very plain and intelligible. As is expected, indeed required, in works of the kind, he has, with much industry and patient research, placed before his readers an abundance of authorities, as well those supposed to be against as those which favor the rule for which he contends. There is upon this point, as upon too many others, much indifferent and bad law scattered up and down in the books; and the author seems to have found it quite as easy, if not easier, to refer to law of this sort as to that which was good. In note 84 will be found the authorities sustaining his views, and among them are such great names as Lord BACON and Lord MANS-

FIELD, with others of lesser distinction and celebrity. In note 85 the opposite authorities are collected. This court finds still less difficulty in agreeing with the learned writer, from the fact that the point was expressly so adjudicated in *Sans v. Joerris*, 14 Wis., 663. It was there held, for the reasons and upon the authorities found in the opinion of the majority of the court, that, though the jury found the libel was published without malice or design to injure, yet the action could and should be maintained, and a verdict of not guilty could not be justified on that ground.

In § 88, Mr. Townshend states the rule of pleading, that it is not necessary to allege malice in the declaration, and refers to some adjudged cases, and among others to *Duncan v. Thwaites*, in the King's Bench, 3 B. & C., 556, 585, where ABBOTT, C. J., delivering the opinion of the court, says that an allegation of malice in a declaration for libel is " rather to exclude the supposition that the publication may have been made on some innocent occasion, than for any other purpose."

Considering, therefore, the nature of the action, and that malice, whether it be such as is inferred from the libelous publication itself, or such as is superadded or proved by evidence of other facts and incidents, is a mere circumstance in aggravation, used only to enhance the damages by way of punishment to the defendant and for public example, it seems the more appropriate that evidence of the absence of it, that is direct evidence of the kind here spoken of, should be admitted under the general denial; and it seems also the more clear that it was not the intention of the provision of the code above referred to, to exclude it. Counsel for the plaintiff contends, and he sustains himself by numerous references, that it is competent for the plaintiff, without specific allegation or any thing in the complaint to point to the facts to be proved, to introduce evidence and accumulate proofs of malice, aside from and beyond that to be implied from the publication itself, for the sole purpose of enhancing the damages to be recovered. If

this is so, and we do not question it, it is manifest, as to the aggravating circumstances so proved, that the plaintiff has decided advantage over the defendant, who, when it comes to the mitigating circumstances relied upon by him, must spread them upon the record by proper allegations in his answer. This may be looked upon as a very unfair rule; and yet it seems to follow from the provision of the code in actions of this nature.

And here it seems proper to correct what may be an erroneous impression derived from the language of the former opinion in this case (27 Wis., 610, 611), that there is or may be a distinction, in actions of this kind, between express malice or malice in fact, and implied malice or malice in law, such that the former may be rebutted or disproved, but that the latter admits of no disproof or explanation. The language seems also to proceed on the theory that malice of some kind, at least that which is called *implied*, is necessary to sustain the action. Rejecting that theory, as we now do, it follows that we must also reject the supposed distinction between the different kinds of malice, which in truth seems never to have rested on any good foundation. Mr. Townshend, in the sections above referred to, has exhausted the learning upon this subject, and has helped as to what we consider the true explanation of the terms "express malice" and "implied malice," as used in the law. It is that given by that distinguished lawyer Nicholas Hill, in argument in *Darry v. The People*, 10 N. Y., 123. Mr. Hill says: "The term *express* malice originally meant malice proved independently of the mere act from which death resulted, and *implied* malice, the reverse. They therefore described *only different modes of proving* actual guilt, *not different degrees* of it; and they belonged to the law of evidence, and not to a definition of homicide. They did *not even indicate different degrees* of evidence, both kinds, when sufficient, being conclusive until overcome. And they were applicable to every case where proof of the actual intent was requisite to characterize the offense."

And the same definition is given by SELDEN, J., in *Lewis v. Chapman*, 16 N. Y., 372, which was an action for libel. He says: "It has been sometimes divided into legal malice or malice in law, and actual malice or malice in fact. These terms might seem to imply that the two kinds of malice are different in their nature. The true distinction, however, is not in the malice itself, but simply in the evidence by which it is established. In all ordinary cases, if the charge or imputation complained of is injurious, and no justifiable motive for making it is apparent, malice is inferred from the falsity of the charge. The law, in such cases, does not impute malice not existing in fact, but presumes a malicious motive for making a charge which is both false and injurious, when no other motive appears. Where, however, the circumstances show that the defendant may reasonably be supposed to have had a just and worthy motive for making the charge, there the law ceases to infer malice from the mere falsity of the charge, and requires from the plaintiff, other proof of its existence. It is actual malice in either case; the proof only is different."

In this case, therefore, the bad intent or malice implied from the communication, unless indeed it may be said conclusively to appear therefrom, is as much the subject of disproof or refutation as would be that malice which is sometimes termed express. The same kind of malice, that is, actual malice, is intended by both expressions.

And this brings us to the second question above stated, which is, whether it was competent for the defendant to testify that he did not intend to charge the plaintiff with being bribed. The publication complained of is certainly calculated to convey that impression, and for that reason has been pronounced defamatory and necessarily injurious to the character and feelings of the plaintiff on its face. For the impression thus produced, and the injurious consequences which followed, that is, for all actual damages sustained by the plaintiff, the defendant must respond in this action, without regard to his intent in

the particular named. It was a wrongful and injurious act in him, whatever his intent or motive may have been. If he intended falsely to charge the plaintiff with bribery, it was a wicked and malicious act, for which he should in addition be punished with vindictive damages or smart money, according to the circumstances of aggravation. On the contrary, if this last was not the character of the act, then only compensatory damages should be given. Does the communication necessarily and conclusively show an intent — a secret and invisible purpose in the mind of the defendant — to charge the plaintiff with bribery? Or, notwithstanding such may be the impression produced by the words, may the intent not have been wanting? Is there no room — no just or rational ground — for doubt or speculation upon the point? It is well known there is nothing about which people so habitually differ as the meaning of words and sentences, or the ideas and intentions of speakers and writers designed to be expressed by them. Lawyers and courts are busy all their lives long explaining, expounding and determining their meanings, so frequent and so constant are the cases of doubt. Upon recurring to the language of the publication itself, and perusing it carefully, we cannot discover any certain and indubitable evidence that it was in the mind of the defendant, when writing it, to charge the plaintiff with being bribed. It is possible he may not have had such intent; and, being possible, other evidence on that subject was admissible to show its absence, and to be considered by the jury in connection with the question whether vindictive damages should be given or not.

Upon the question as to what intent or intention is, Mr. Townshend, who seems to have explored the fields of moral and mental philosophy as well as of the law (§ 83), says: "Intent or intention is a mental conception — an existence. It is a fact, impalpable, intangible, invisible, but nevertheles a fact. The existence or nonexistence of an intent or intention, and its character, are always questions of fact. Save the declara-

tions of the individual in whose mind the intent is supposed to exist, we can have no *direct* testimony as to the existence or nonexistence of any intent, or its character. Save such declarations we can have none but *indirect* testimony. That indirect testimony is the inference we may draw from his acts." In a note to the same section he refers to the case of *Clift v. White*, 12 N. Y., 538, where MARVIN, J., says intention is a fact. He refers also to *Seymour v. Wilson*, 14 N. Y., 567 ; *Griffin v. Marquardt*, 21 N. Y., 121 ; and to *Forbes v. Waller*, 25 N. Y., 439, in which it was held that a witness may be asked with what intent he did an act, but his evidence is not conclusive. . He furthermore cites certain cases in which it has been held that the question is not permissible, as where the intent may be or must be inferred from the act. *People v. Saxton*, 22 N. Y., 309 ; *Parker Mills v. Jacot*, 8 Bosw., 161 ; *Ballard v. Lockwood*, 1 Daly, 164. The note then proceeds : "We are not aware of the right to put the question as to intent having been mooted in an action for slander or libel. We suppose it could not properly be put in any action for slander or libel, because we are of opinion the question of mere intent can never be material in those actions. But assuming that intent is or may be material, then the question might be put in connection with a state of facts which discloses a qualified legal excuse. In our opinion the decisions show the rule to be : you may inquire into the intent directly, as by inquiring of the party, in cases where the intent is material, and the act complained of is as consistent with a good intent as with a bad intent, but in no other cases. (*Booth v. Sweezy*, 8 N. Y., 281 ; *Ellis v. The People*, 21 How. Pr. R., 356 ; *Powis v. Smith*, 5 B. & A., 850)."

Differing from the author as to the view that intent may not become material in an action for slander or libel, that is to say, bad intent or malice, when urged as a ground for enhancing the damages, we concur with him in saying that direct evidence, as by the testimony of the party, may be received to disprove it, wherever the act complained of is not clearly and necessari-

ly inconsistent with the supposition that such bad intent or malice did not or may not have existed. Such, we think, was this case, and such the error in excluding the testimony offered by the defendant.

We also think it was error to refuse the fifth instruction asked for by the defendant. In some respects inaccurate, according to the views expressed in this opinion, though not materially or fatally so under the circumstances, the leading idea or principle embodied in that request was correct, and the jury should have been so instructed.

For these errors the judgment appealed from must be reversed, and a *venire de novo* awarded.

*By the Court.*—So ordered.

*Mr. E. G. Ryan*, in behalf of the respondent, moved for a rehearing; and the motion was granted, and the following opinion filed, at the June term, 1873.

DIXON, C. J. The court sees no occasion for receding from the general principles of law laid down in the opinion, or doubting their correctness, but is in very considerable doubt whether correct rules of practice have not been overlooked and departed from in the application of those principles to the present case. It is argued in support of the motion for a rehearing, that the whole discussion of the question of malice, in the opinion, and when and how it might be disproved by the defendant in mitigation of damages, has no foundation in the bill of exceptions. Quoting the question cited in the opinion as the foundation of the discussion, counsel argues as follows: "But it is not a question calling for motive, justifiable or unjustifiable, or touching malice in any way. It is a question of construction of the libel. The writer of the libel is on the stand. He is asked nothing of his motive. He is asked what he intended in the article; that is, by the article. It is not a question of what he intended out of the libel, but what he intended

Wilson vs. Noonan.

in the libel.   It is a pure question of the meaning of the libel. It was put to give the appellant an opportunity of overruling, under oath, the construction put upon it by the judgment of this court." The same course of argument is pursued, and it applies with equal force to the other questions put to the defendant, and which are referred to in the opinion. All the questions are quoted in the printed argument of counsel, and further and more careful examination has satisfied us that there is some ground for the criticism, and for supposing that such was the purpose for which they were put.   We must say that they look to us now very much like mere questions of construction of the libel; and if such was their nature or the object with which they were asked, their inadmissibility is obvious. But if such was not the intention in asking them, yet if they were so framed as to exhibit that intention, or to lead the court below and counsel opposed to believe that such was the object, and at the same time not to disclose that the purpose was to show a justifiable motive or the absence of malice in the defendant, they are equally defective, within the rules of practice in such cases as settled by the decisions of this court. And these are the matters as to which this court is in doubt, and which it desires to hear discussed on the reargument of this cause.   The rehearing has been ordered for this purpose.

In *Beard v. Dedolph*, 29 Wis., 136, 143, this court had occasion to consider a similar question ; and it was there held that although the general rule is indisputable, that, when evidence offered is competent for any purpose, it should be received, and to reject it will be error, yet it is the duty of a party, when evidence offered by him is excluded as being inadmissible for the purposes for which it was offered, to inform the court if he had any other purpose in view in making the offer; otherwise its exclusion cannot be alleged for error on appeal, on the ground that it was admissible for such other purpose.   This court decided that the purpose of the offer there made was apparently the illegitimate and improper one, and that the court below

must have so understood it when the evidence was excluded. The correct practice in such cases is indicated by the following remarks in the opinion :   " Parties cannot come to this court for the correction of errors or mistakes of this nature, which, on mere suggestion, would have been corrected or avoided in the court below.   It is their duty to speak and make known their purposes and objections there, when the same are necessary for the proper information and guidance of the court, and not, by their silence or mode of presenting their claim or defense, to lead the court unwittingly into error, upon a point not brought forward for its consideration, and not considered."

Other decisions of this court showing the particularity of exception required when necessary to direct the attention of the court or counsel to the precise point of objection, are cited in *Kellogg v. Railway Co.*, 26 Wis., 286.

*By the Court.* — Motion for rehearing granted.

Upon the rehearing, the cause was argued by *Mr. Ryan* and *Mr. Fraser* for the respondent, and by *Mr. Smith* for the appellant.   *Mr. Ryan* argued, in substance, that if, in such actions, the defendant, as a witness in his own behalf, can be permitted to testify directly as to the question of malice, still the questions put to him must call only for his *mental consciousness* as to his own feelings toward the plaintiff, and his purposes in regard to him, in making the publication — whether he was actuated by malevolence towards plaintiff, or had a desire to injure him in his feelings, reputation or interests ; that none of the questions put to defendant on the trial of the present cause were of this character, but all of them either called for the defendant's *construction of the article* complained of, or pertained to matters entirely irrelevant, and having no proper bearing on the question of malice ; and that even if any of these questions were susceptible of the construction now claimed for them — that they were questions bearing upon *malice* — it was obvious from the bill of exceptions that they were not so understood

in the court below, either by the judge or by the plaintiff's counsel, and that defendant's counsel did not disclose the fact that the evidence was offered for that purpose. *Mr. Fraser,* among other things, contended that where the offer of evidence which is rejected is open to two constructions, one of which is not legitimate, the party making it cannot insist, in a court of review, on the construction most favorable to himself, unless it appears that he was so understood by the court. *Keller v. Railroad Co.,* 24 How. Pr., 172, 185; *Daniels v. Patterson,* 3 N. Y., 47, 51; *Chapman v. Brooks,* 31 id., 78, 88; *Beard v. Dedolph,* 29 Wis., 136, 143–4. 2. That there is a distinction between the intent *to do an act,* and the intent to produce the *consequences* of the act (Townshend, §§ 78, 79); that it is the intent *to injure* which constitutes *malice,* and the absence of which may be sometimes shown in mitigation of damages (Townshend, § 87, note 75; *Viele v. Gray,* 18 How. Pr., 550, 564); and that in libel, the question whether defendant *intended to make a certain charge,* and whether he *did make* such charge, are questions calling for a *construction* of the alleged libel.

*Mr. Smith* argued that the *intention* of the defendant in writing the article was a legitimate subject of inquiry as bearing upon the question of malice, or the *degree* of his guilt, and the amount of damages; that in such cases *intention* and *motive* are synonymous; and that it was obvious from the record that the questions rejected were asked for the purpose of showing that the article in question was written with good intentions, and without malice, not for the purpose of defeating the action entirely by establishing defendant's construction of the article, but for the purpose of mitigating the damages; and that the court, in overruling these questions, proceeded upon the theory that the absence of malice could be shown only by proof of the facts and circumstances, and not by the direct evidence of the defendant on that subject. He further argued that the judgment must be reversed for the refusal of the five instructions which this court hold should have been given.

The following opinion was filed at the January term, 1874:

DIXON, C. J.   However counsel may look upon it, this court cannot but regard the question presented on this rehearing, considered as a question of practice merely, as one of much gravity and importance; and it is certainly a great pity that the learned counsel for the defendant, intending, as they say, to show the absence of malicious motive or bad intent on the part of the defendant, did not so frame their questions and make their offer of proof in the court below as to make that purpose clearly and unequivocally plain and intelligible to the court and to counsel opposed.   Such course, which was very easy, would have saved counsel on both sides much time and trouble, and the members of this court much patient study and anxiety over the question.   As to what the practice is and should be in such cases our views are as stated in the opinion granting the motion for a rehearing.   They are the same as expressed by BRONSON, J., in delivering the opinion of the court in *Daniels v. Patterson*, 3 N. Y., 51, where he says: " Before a party excepts on account of the rejection of evidence, he should make the offer in such plain and unequivocal terms as to leave no room for debate about what was intended.  If he fail to do so, and leave the offer fairly open to two constructions, he has no right to insist, in a court of review, upon that construction which is most favorable to himself, unless it appear that it was so understood by the court which rejected the evidence.   And if the meaning of the offer depends on argument or inference, he must have much the best of the argument before a court of review should reverse the judgment."

In view of this well settled rule respecting the manner of introducing proof and conducting the examination of witnesses, which we think most important to be adhered to and enforced, we must say that the arguments of counsel for the defendant, able and well considered as they confessedly are, fail to convince us, and we think must fail to satisfy any court,

that there was error, or at least reviewable error, in the rulings of the circuit court in sustaining the objections taken to the questions put to the defendant as a witness, and in rejecting the offer of evidence which was made. In order to the just appreciation and proper solution of this question, it is necessary for us, as near as may be, to suppose ourselves in the place of the court below, and deciding the question of admissibility as it presented itself to the mind of that court, and as that court had the right to understand, and must be reasonably presumed to have understood the proposition before it, and the object of counsel in calling out the testimony. We must do this, and give a construction to the questions put to the witness and the offer of proof made, as the same were, or must, or might reasonably have been understood by the court below, without the aid of the elaborate arguments and re-arguments and thorough investigations which have taken place in this court. We can only learn in what light the court below viewed the proposition, and what it considered, and was justified in considering, to be the purpose of counsel, by examining the interrogatories, the objections which were taken to them, and the rulings of the court upon those objections. The objections taken and reasons assigned show very clearly how counsel for the plaintiff understood the questions put, and the object in putting them; for the principal ground of objection was, and it was several times repeated, that the questions called for an answer giving a construction to the article against that given to it by the court, and contrary to the legal import and construction of the words used in it. The objections so taken, and for the reasons given by counsel, were sustained by the court, which raises a very strong presumption that the court must have held the same opinion respecting the purpose and effect of the questions asked, and the offer of proof made. But it is the questions themselves, which, as it seems to us after the most mature deliberation, furnish the clearest evidence of how the court must have understood the matter, and how and why it was fully

justified in such understanding. The form and words of the questions are such as to produce the impression, which, wrestle and strive against it as we may, can not be shaken off, that it was a construction of the writing which was sought, and not mere evidence of the want of malicious intent or bad motive in the writer at the time it was written. The frequent and almost constant recurrence in the questions, of the words, "in that article," or "in the article," as in the first question asked, and several which followed it, point clearly and definitely to the construction of the article, and to nothing else with any certainty and precision, or with so much certainty and precision. The intention having been, as the learned counsel assert, to show the intent of the defendant, not as exhibited in or by the article, but as it existed outside of the article and in the mind of defendant at the time of writing it, it seems certainly very strange that these words should have found their way so often and with such persistency, into the questions which were asked. Whatever learned counsel may have intended, the presence of these words can not be disconnected, in the mind of the reader or hearer, from the idea that it was the witness's construction of the article that was sought after and intended. The idea forces itself upon the mind with so much strength, after reading the questions, that it is difficult to conceive how the court could have otherwise understood them ; and knowing, as we now do, that something else was intended by counsel, it becomes a marvel almost that some different form of expression was not adopted. If, in place of the words above quoted, the words "at that time," or "at the time," had been used, they would have had some tendency to enlighten the court as to the meaning and purpose of counsel putting the questions. They would have had some tendency to show that the object was to bring out from the witness something separate from and independent of the legal intent or construction which the court had put upon the article.

The legal intent or judicial construction of the article was

not a matter to be disproved or avoided by the oath of the defendant, and for that purpose his testimony was wholly incompetent and inadmissible. It was only the defendant's individual intent, or intent as the operation of his mind, hidden from others and known only to himself, to which he was competent to testify. It was this intent which we said in a former opinion was, on a fair construction of the article, open to him to disprove. We·said that the article, however it might carry that impression to the minds of others or be so construed by the courts, yet furnished no such clear and indisputable evidence on its face of this individual or inward intent and purpose to malign or to charge the plaintiff with having received a bribe, as to exclude direct evidence to the contrary, or that such inward intent did not exist. Of course, cases have arisen and may arise again, where the language of the publication is so clear and positive to show the inward intent and malicious purpose and motive, that the rejection of such evidence could not be looked upon as error. But we said and still say of this case, notwithstanding the outward manifestations, that exculpatory evidence of the kind was admissible when offered to rebut the presumption of malice in fact raised by the publication, and to meet and negative any claim which might be made for vindictive or punitory damages on that ground. Now, with this understanding of the proposition on the part of this court and the same on the part of the learned counsel for the defendant at the trial, it is certainly somewhat remarkable that no question should have been put to the witness directly calling for his intent as it existed in his mind independently of the article and apart from what he there wrote and published, or from what there appeared or might be inferred to have been his intent at the time of publication. It would have been very easy to put the questions in that form, which would at once have made the object of counsel apparent to the mind of the court; but no such questions were put, and there is nothing in the record to show that the court below understood or could

have understood the matter in this light at all. The questions were to all appearance addressed to the intent of the defendant as exhibited in the published article, and so apparently aimed at proving by the oath of the defendant that publication not to be libelous which, in judgment of law, had been finally and conclusively pronounced so to be. The difference is between intent in the publication and intent out of it; and here lies all the difficulty respecting the course of examination which was pursued. As already observed, intent in the publication, or that injurious and defamatory character and quality which the law adjudges it to have, — the insinuation or charge of being bribed there found or inferred, — is not the subject of disproof by the oaths of witnesses; for if it were, and the testimony were believed, the jury might find as matter of fact that not to be a libel, which the court as matter of law had solemnly determined to be such. There is, therefore, this plain difference between what was intended in the publication, which, for the purpose of giving compensatory damages or requiring the defendant to make full pecuniary reparation for the injuries sustained by the plaintiff, is conclusively presumed against the defendant, and he is absolutely held to and bound by, and what was intended out of the publication, which, going to the question of mental [design on his part, or of malicious purpose or bad motive in him, and so only to the question of damages to be inflicted by way of punishment, is in the nature of a repellable or inconclusive inference, and may be disproved by testimony, if properly offered or introduced for that purpose.

The nearest approach to what might be considered legitimate testimony is probably that contained in the offer. The offer was this: "We propose to show that, whatever the article may say, he, the defendant, did not intend to say that." Here again was a direct reference to the publication, and to what was there said; and the proposal was to show that the defendant "did not intend to *say that.*" Say what? we ask; and the answer immediately comes up, *say that which was said in the*

*publication;* and we are brought face to face with an offer to give verbal testimony of intent in the publication, which is a question of law for the court, and not of intent out of the publication and in the mind of the defendant, which means the same thing as motive, good or bad, malicious or otherwise, leading to the publication, and which is a question of fact for the jury.

The conclusion is therefore irresistible to our minds, and we are constrained so to hold, that there was no question put, or offer of proof made on the trial below, which raised any issue or involved any inquiry respecting the intent of the defendant aside from that which appeared in or was inferrable from the published article itself. We are satisfied that the question of disproving or proposing to disprove intent, as synonymous with malicious motive or set purpose to injure and to defame, was not brought to the attention and understanding of the court, but that the court, in sustaining the objections and excluding the testimony, had in view and was considering quite another question, with reference to which the testimony was wholly inadmissible.

But it may be said that the course of inquiry pursued, if suffered to go on, would have resulted in calling out the very evidence which this court now holds to be admissible. Incidentally and indirectly this might have been so, but still it does not cure the defects or obviate the difficulties now to be contended with. It does not show that the court below erred in its conclusions, or tend at all to relieve the case of the defendant from the operation of the rule of practice above laid down. The most that can be said in favor of the questions, or some of them, rejected by the court below, is not that they bordered on or touched the line separating competent from incompetent evidence, but only that they remotely tended in the direction of that line. They are not questions which might indifferently have been admitted or excluded, but those the allowance of which would have been a clear violation of well settled principle.

It may perhaps be proper here, in view of the arguments of counsel, to make some observations upon the distinction existing or which may exist between intent in the publication and malicious motive or bad intent out of it. The writer or publisher may have intended to say or to charge just what the publication imports, and which is most defamatory and injurious as to the person of whom it is written or published, and yet there may have been an entire want of actual malice or bad intent or purpose in the writer or publisher. He may have written or published in the honest belief that what he said was strictly true. He may have done so of a total stranger, against whom he had and could have no feelings of ill will or malevolence whatever. He may have done so even of a friend or near relative, whose fall he most sincerely regretted, and in whose misfortunes he deeply sympathized. Intent in the publication, therefore, and intent out of it, by which we mean unjustifiable motive or bad purpose in the writer or publisher are, or may be, according to the various circumstances by which the cases are surrounded, entirely distinct and distinguishable things.

It remains now only to say a few words respecting the fifth instruction which was asked and refused. That instruction received but a qualified approbation in the former opinion, and it was only as incidental and subsidiary to what was then considered the other and the main ground of error, that it was remarked that it ought to have been given. It might perhaps have been given with safety ; and if it had been given, it may be that the plaintiff would not have been heard to complain of it as error. But when we come to consider the refusal as the principal ground of error, or the sole one found in the record on which to reverse, we must say that we do not think it can or ought to have that effect. As observed in the former opinion, the request was in some particulars faulty and imperfect ; and if, at the time of granting the motion for a rehearing, it had been considered that the refusal to grant the request was fatal error, it would have followed as matter of course that the

motion for a rehearing should be denied. It was not at that time considered as fatal error, nor does the court so consider it now. We think that that part of the request which stated that if the jury found no express malice, then the law from the publication implied " malice sufficient to sustain this action, at least for nominal damages," was in some measure calculated to confuse and mislead the jury. The only instruction which could under the circumstances have been correctly given to the jury, was, that the plaintiff was entitled to recover at least actual damages. The actual damages sustained by the plaintiff were, on the facts supposed, the minimum for which the jury would have been justified in returning a verdict for the plaintiff; and that part of the request to charge where nominal damages were spoken of as the smallest sum, was clearly inaccurate. And although the actual damages sustained by the plaintiff were afterwards mentioned in the request as being within the province of the jury to give, yet it was done in such a way, without marking the distinction between actual and nominal damages, that we are by no means sure that it would have removed the erroneous impression which might have been conveyed to the minds of the jury by the incorrect statement of the rule previously made. Without explanation or some further instruction designed more particularly to guide them, the jury might have confounded the rules with respect to actual and nominal damages, and possibly have thought under the circumstances, that both signified the same thing. We know not what impression the jury might have received from the incorrect statement of the rule of damages first made in the request, or from the giving to them of the two inconsistent rules ; and this is the fault which was alluded to in the first opinion filed in this case. It may not be looked upon perhaps as a very grave or serious imperfection, but yet is sufficient, we think, to relieve the refusal of the court from the imputation of error, when such refusal is urged as the sole ground of reversal. The rule is well understood, that re-

quests to charge, to work error in their refusal, must be themselves without fault.   The request in question was, as we have seen, not without fault, and we do not think it was error to refuse it for which the judgment can be reversed.

It follows from the views above expressed, that the judgment appealed from must be affirmed.

*By the Court.*—Judgment affirmed.

A second motion for a rehearing, made by the appellant, was denied at the June term, 1874.