**1812.**

*Pittsburg,*
*Saturday,*
Sept. 19.

# M'Clurg *against* Ross.

### IN ERROR.

THIS was an action in the Common Pleas of *Alleghany* for words.

The declaration alleged, that the defendant *Ross*, on the 6th of *October* 1808, uttered the following false scandalous and malicious words of and concerning the plaintiff, in the presence of divers citizens, to wit " *Joseph M'Clurg* (the " said *Joseph* meaning) *was an United* Irishman, *and got* " *the money of the United* Irishmen *into his hands, and ran* " *away with it;* (meaning that the said *Joseph* had abscond-" ed, and had feloniously appropriated the said money, to " his own use, and thus had committed a felony) *and is now* " *a rich man at Pittsburg.*"

The jury gave a special verdict, in *August* last, in which they found the publication of the words, in manner and form as the plaintiff had declared; and that the plaintiff was a member of an association of United *Irishmen* formed in *Ireland*, the object of which was to effect by force of arms a revolution in the government of that kingdom. But whether the words so spoken were actionable, they were ignorant, and prayed the advice of the court. If upon the same matter it should seem to the Court that the words were actionable, then they found the defendant guilty, and assessed the damages at 20 dollars, and six cents costs; otherwise, they found him not guilty.

The Court below, being of opinion that the words were not actionable, gave judgment for the defendant; and now, upon this writ of error, the case was argued by

*Mountain* and *Wilkins* for the plaintiff in error:

*A. W. Foster* and *Baldwin* contra.

Tilghman C. J. after stating the finding of the jury and the words laid in the declaration, delivered his opinion as follows:

There is no doubt but these words if believed, must very

*Margin note:* With certain exceptions as to persons in office, special damage &c., *words* are not actionable unless they contain a plain imputation of some crime liable to punishment. And unless the words, in their natural and obvious meaning, impute a crime, no *inuendo* can help them

*Hence* to say of a man, that " he was an " *United Irish-* " *man, and got* " *the money of* " *the United* " *Irishmen into* " *his hands, and* " *ran away with* " *it,*" is not actionable, because it imputes a breach of trust, rather than a felony. And if it might be considered to impute a felony in a common case, yet the jury having found that the United *Irishmen* were an association formed in *Ireland* for the purpose of overturning the government, it could be no felony to dispossess them of their funds.

much injure the plaintiff's character. Take them in the mildest sense, and they imply a breach of trust, which is highly dishonourable. This is one of the grounds on which the plaintiff's counsel have rested the support of the action. Cases from the civil law were cited, but we are not governed by the civil law. The common law must be our guide. There is a great difference between words spoken and words written. It is actionable to charge a man in *writing*, with any thing which may degrade him in the estimation of society. But many things may be *spoken* which afford no cause of action, although they contain charges of wicked and disgraceful conduct. This distinction is not without reason. Words are often spoken in heat, in haste, and with very little reflection or ill intention, and frequently forgotten or repented of as soon as spoken. But writing requires deliberation, and is therefore more injurious to the character attacked. We are apt to suppose that before a man reduces an accusation to writing, he has satisfied himself of the truth of it; and if he has not satisfied himself, his conduct is certainly very reprehensible. Besides the scandal is more permanent and more widely diffused. So that whether we consider the injury itself, or the mind of the person by whom the injury is committed, a libel is entitled to less allowance than a slander by words. It would be a waste of time to cite cases in support of this distinction. Every one knows that to say of a man that he is a *rogue* or a *liar*, is not actionable. It may be asked then, what is the rule by which words are determined to be actionable or not. I will not say that the cases to be found on this point are in perfect unison. But from a full consideration of them, I think myself warranted in laying it down, that (with certain exceptions as to persons in office, special damage &c.) words are not actionable, unless they contain a *plain imputation of some crime liable to punishment*. Such was my opinion in the case of *Shæffer* v. *Kintzer*, 1 *Binn.* 542, and I have found no reason for altering it. Let us then test the words in this declaration by that rule. It is not said that the defendant *stole* any person's money, but that being an United *Irishman* himself, *he got the money of the United Irishmen into his hands, and ran away with it.* Taking these expressions in their natural and obvious meaning, which is the fair mode of construction, they do not seem

*1812.*

M'CLURG
*v.*
Ross.

M'CLURG
*v.*
Ross.

to import a felonious taking. I should rather understand that *M'Clurg* had got money into his hands by the consent of the association of which he was a member, and then broke his trust and absconded; very dishonourable conduct to be sure, but very different from felony. But it is said that we must now take it to be a felony, because the declaration avers that the charge of felony was *intended*, and so the jury have found it. It was decided by this Court in *Shæffer* v. *Kintzer*, that an *inuendo* cannot alter or extend the fair meaning of words. Unless the words therefore without torturing them, imply a charge of felony, neither the *inuendo* nor the verdict will help them. The case of *Borman* v. *Boyer*, 3 *Binn.* 515, was relied on by the plaintiff's counsel. But there the words were much stronger than they are here, for they plainly insinuated a taking in a *secret* manner and not *without guilt*. But there is another very striking feature by which this case is distinguished from *Borman* v. *Boyer*. The plaintiff was an United *Irishman*, and it was the money of the United *Irishmen* that he got into his hands. As an *American* judge, I know nothing of the dissensions which have distracted the *British* empire. It is not for me to offer an opinion in this place, whether the government, or the people were in the wrong. But so far as the jury have introduced the subject into their verdict, I am bound to take notice of it. The jury then have found, that the United *Irishmen* were an association formed in *Ireland* for the purpose of *overturning the government by force of arms;* in other words, that they were in *rebellion*, or what could have had no other name from the *British government*. The charge against the plaintiff is, that he got the money of this association into his hands; for such is the plain meaning of the words. It is refining too much to say, that the words may be applied to the *private property* of the members of the association. Now then, when a body of men are associated for a *treasonable purpose*, and have provided money for effecting their object, is it a *felony* to dispossess them of their funds? Would it be so construed by the *British courts*, for that is the question? It appears to me that it would not; and therefore I cannot see how the words laid in the declaration import a *crime*, which rendered the plaintiff liable to *punishment*. They do not come within the rule which I have laid down, and con-

sequently give no cause of action. I must be of opinion then, that the Court of Common Pleas were right in giving judgment for the defendant.

Yeates J. Uniformity of decision in the administration of justice under every well regulated government, is of the utmost importance to the general weal. The law is no longer vague or uncertain, the rights of individuals are precisely ascertained, and the streams of justice flow in their accustomed channels.

It is freely conceded, that the cases in our books respecting actions of slander cannot be reconciled. The prevailing opinion formerly was, that defamatory words were always to be construed in their milder sense; but this has been long exploded, and a more correct principle introduced, that their construction shall be governed by their plain and ordinary import, according to the common understanding of mankind. The law in *England* seems to have been settled in *Onslow* v. *Horne* in 1771, 3 *Wils.* 186, that the words must contain an imputation of some crime liable to punishment, as well as a precise charge. But though the words be not actionable in themselves, yet if spoken of one in any trade, profession or office, which may be of probable ill consequence to such person, they will afford a ground of suit. The imputation of the mere defect or want of virtue, or the disregard of moral duties or obligations, which render a man obnoxious to mankind, is not actionable. *Ib.* 187. This doctrine has been recognised in *Pennsylvania* in repeated instances, both before and since the *American* revolution, as well as in our sister states generally; and if a wise and prudent legislature would fix the law on this matter by positive institutions, I do not know, that a more convenient or proper system could be adopted. To give encouragement to the vindictive passions, by sustaining actions for general expressions of censure by individuals in their daily intercourse with their fellow citizens, would not conduce to the peace of society. But it is not for this court to new model the law; we are bound to pronounce it as it is written.

The jury have here found that the defendant maliciously spoke these words, " *Joseph M'Clurg* was an United *Irish-* ' *man,* and *got* the money of the United *Irishmen* into his

" hands and *ran away* with it, and is now a rich man in *Pitts-* " *burg.*" They have also found, "that *M'Clurg* was a member " of an association of United *Irishmen* formed in *Ireland.* the " object of which was to effect by force of arms, a revolution " in the government of that kingdom;" and by adopting the sense attributed to the words in the *inuendo*, they have thought the expressions imported a charge of felony. This is of some weight, but not conclusive. The duties of our office enjoin on us to determine, whether the words are actionable or not.

What meaning then would the common understanding of mankind affix to these expressions? I admit without hesitation, that the words convey a charge of moral turpitude and depravity against the plaintiff. But it must be brought to a closer test; and to ascertain whether the words are actionable or not, we must inquire whether they impute a crime liable to punishment, and charged with precision. On this head the counsel have argued with much ingenuity. It is admitted on both sides, that the *inuendo* cannot change or vary the meaning of words spoken. In this disquisition it is evident, that much will depend on the true meaning of the verb *got*, construing the whole sentence fairly. Because if *M'Clurg received* the money of the United *Irishmen* for the use of that association, but converted it to his own use, it would be a breach of trust base and dishonourable to himself unquestionably, but not punishable by indictment. The verb *get* in its common and ordinary sense signifies to *procure*, to *obtain*, according to Dr. *Johnson.* It may sometimes mean, *to seize by force*, where the context will justify that meaning. The counsel for the plaintiff in error have admitted, that *got* standing alone would not imply a *felonious taking*, but that connected with running away with the money and being enriched thereby, a construction is stamped on the expressions, of a felony committed. This is their strong ground; and they further insist, that it does not appear on the whole record, *where* the money was got, whether in *Ireland* or elsewhere. It is true, the words do not expressly charge the place where the transaction happened; but by comparing the expressions with the fact found by the jury, that the plaintiff was a member of the association formed in *Ireland* to subvert the *Irish* government by force, we are irresistibly led to

fix the scene of action in that kingdom. *Running away* with the money of another, does not necessarily involve the guilt of larceny; but it is usually applied to a person indebted, who has absconded. It implies a defect of moral obligation, but not that the party stole such money in the first instance. This construction more naturally arises in the present instance, when we consider the plaintiff as a member of the affiliated society of *Irishmen*, actively engaged in effecting a revolution against the known and established laws of that country.

Much reliance has been placed on the decision of this Court in *May* 1811, between *Bornman* and *Boyer*, 3 *Binn.* 515. But in that instance, the words spoken evidently implied a charge that *Bornman* took the leather out of the cellar of *Boyer secretly*, without his *consent*, and we could not infer hat a charge of trespass merely was intended. I then expressly said the case was not free from doubt, but on the fullest consideration, I am not dissatisfied with our determination. I never will agree that a man shall escape making compensation, who *indirectly* slanders the reputation of another, by using expressions which plainly imply a felony, and cannot reasonably be taken in any other sense. But my mind is not satisfied that the present case is of that nature. On the contrary, it appears to me that the plain and natural import of the words spoken, is, that the plaintiff in error was charged with a breach of trust, in converting to his own use the money which he had received for the purposes of supporting the cause of the United *Irishmen* in *Ireland.* However gross and unjustifiable the charge may have been, I cannot pronounce that the words afford a ground of action under all the circumstances of the case, and the declaration and verdict. As a man I may condemn the conduct of the defendant in error, but as a judge I cannot say that the words are actionable. I am therefore of opinion, that the judgment of the Court of Common Pleas of *Allegheny* county should be affirmed.

BRACKENRIDGE J. The elementary mind of the counsel (Mr. *Mountain*,) has led him to investigate the decisions on the law of slander, and to shew that many of them have been founded in error. Certain it is that early decisions have not

1812.

M'CLURG
v.
Ross.

always had good reason; for it is on this ground, that they have been alleged to be reversed in many cases, by the subsequent. And it is by a re-examination and change of determination, upon better ground of political or moral reason, that the common law has come to be considered the perfection of reason. *Errores ad sua principia referre, est refellere.*

Whether it is error, that the criterion of what shall be considered actionable in slander, shall be that of *a malum in se*, punishable by law, or be carried farther, will deserve investigation. It shocks the mind to think, that that alone, the imputation of an indictable offence, shall be the criterion, when other words that may be spoken, are equally provoking, *and may lead to a breach of the peace.* I would be willing to adopt this as a criterion; that defamatory words which would impel a man of a reasonable mind to inordinate passion, and the meditation of revenge, might warrant the seeking a redress by action. This it is true, would exclude a general rule, and put every case for words on its own bottom.

I have heard, says Chief Justice *Holt*, (2 *Ray*. 960,) Justice *Twisden* say, that he knew of no rule to go by, in an action for words; and said *Gould*, Justice, so said my Lord *Hale*, for all words stand on a different bottom. And continues *Holt*, where words tend to slander a man, and to take away his reputation, I should be for supporting actions for them, *because it tends to preserve the peace.* He remembered a story told by Mr. Justice *Twisden*, of a man who had brought an action for scandalous words spoken of him; and upon a motion in arrest of judgment, the judgment was arrested, and the plaintiff being in the court at that time, said, that if he had thought he could not have recovered in his action, he would have cut the throat of his adversary.

But it will not be necessary for me to take this more extensive consideration of what shall be accounted slander, since I incline to be of opinion, that the charge found in this special verdict, is that of *an imputation of a crime.* " Having got," does not absolutely imply the having received it without consent, or having got it, the money of the United *Irishmen*, by unfair means. But it has a looking to it, and would rather imply that it had not been given to him; or if given to him, it was not for the purpose for which it was used by

him.—But " the running away," leaves it without doubt that he had not leave to take it with him; but that he ran away for the purpose of concealing himself and it, from those whose property it was.—This carries with it an imputation of stealing.

" If a horse were upon sale, and the owner let the thief " mount him in order to try him, and the thief rode away " with him, it was felony." 2 *East's Crown Law*, 687, cites *Thel.* 82. But if the taking stood indifferent, it is concluded by the finding of the *inuendo.* For the taking of the money does not exclude a felony, from the nature of the property; nor does the whole sentence, or any part of it, exclude the idea of a felony. " He got the money of the United *Irish-* " *men* into his hands and ran away with it, and is now a rich " man in *Pittsburg.*" *The fact, coupling the inuendo with the words spoken, is for the jury; and the court are excluded.* It cannot now be inquired of by the Court on a writ of error, what the *manner* or the *motive* was of getting the money into his hands; for the jury having found the *inuendo*, it must have been with an *intention* of *stealing* it, for otherwise felony could not be predicated of it. But, supposing the money originally put into his hands and intrusted to him, the moment that he takes a step with it, not according to the original custody, but with a view of abstracting it from its original destination, he is a trespasser and a thief; and therefore, putting myself in the place of the jury, I do not see how I could infer any thing also from the words, but that the so *getting* it, and running away and not refunding, but the having used it, and by means thereof being *a rich man in Pittsburg,* did import a *stealing*, according to the *inuendo* laid.

But the main and principal question in the case will be, could a member of the association of United *Irishmen* formed in *Ireland*, the object of which was, to effect by force of arms, a revolution in the government of that kingdom, be guilty of a crime, in purloining the funds of that association? Certain it is, that with the *home* government, the event stamps the name and the character. According to this, it is patriotism, or it is rebellion. But with those not of that government, it will be considered according to the cause of the resistance and the ground of the opposition. Other countries

will say, and the posterity of the same country will say,
" *Victrix causa diis placuit. Res — — Catoni.*"

They will reverse attainders, ... estates, according
to their sense of the right an ... of the resistance. Are
we at liberty in these states ... in question the right of
the people of *Ireland* to re ... of the *British*
government, after the sole ... them in our
own behalf, by the Congress of the U ... of the 10th
of *May* 1775, the address to the people of *Ireland?* In this
address, they have been considered as labouring under a
like oppression with ourselves. Could there be a doubt of
their right to resist the government in which they had no
part, to resist laws in which they had no voice? In the
emphatic language of that address it is said, " You are not
without your grievances; we sympathize with you in your
" distress, who can have nothing to expect from the same
" *common enemy*, but the humble favour of being last de-
" voured."

Will it not, in a court of justice in this country, be consi-
dered slander to say, that one associate for such a purpose,
had " run away" with the funds, or a part of them, that were
to carry on the war? Or will it be considered the same thing
as if it were said, that one of a gang of robbers had robbed
the bag which was the plunder of the whole?

Independent of the *cause* of the United *Irishmen*, and I
think, in this country, it cannot be unfavourably considered,
it would be felony to take their goods. This being out of the
way, and it being the same thing as taking the goods of any
other person or association in that kingdom, it would be
felony so to take, and run away or abscond. But even ad-
mitting that felony could not be committed of the goods
of United *Irishmen*, and that on a charge of taking such
goods, the United *Irishmen* would be acquitted under the
government and in a court of *Ireland* yet on a charge of
running away for the alleged felony, of which he was sup-
posed guilty, he could be convicted. For by the common law
of *England*, " if a man that is innocent be accused of felony,
" and for fear fleeth from the same, albeit he judicially ac-
" quitteth himself of the felony, yet if it be found that he fled
" for the felony, he shall notwithstanding his innocence, for-
" feit all his goods and chattels, debts and duties; for as to

"the forfeiture of them, the law will admit no proof against "the presumption in law, grounded upon his flight." *Coke Littlet: n* 373, 4. The imputation, therefore, of flying for being a U..ite*.* *Irishman*, or for robbing them of their funds, or for flying itself, would be held slander in that kingdom; and if found, as was the case here, would be accounted defamatory, and entitle to an action.

Be that as it may, it is that with the people of this country, and particularly of *Irish* colonization, of which these settlements where the words were spoken chiefly consist, there could not be a greater slander, or which would work a greater defamation, than deserting the cause of the United *Irishmen*, and detracting from the means of their defence. Who could say that it was not owing to this very act, that they failed at that time, and became the victims of that tyranny which they resisted? Will it do to say that it was better for the nation not to have obtained liberty, because they might have made a bad use of it? It is even said in this country now, that we are in a fair way, by our *mobs*, to make a bad use of our independence; yet this cannot affect the principle of our revolution. I will not admit for a moment that the union cried, of the union of the patriots in this cause.

Did *they* err, said the orator (*Demosthenes*) who fought for the liberties of *Greece*, at *Salamis*, at *Platea*, at *Marathon?* No, by those who fought at *Marathon*, they did not err. Shall we then say, did the United *Irishmen* err? The question will recur, did we ourselves err in our revolutionary contest? The cause was the same. We had our heroes, *Warren*, *Montgomery*, and others. Shall we say these patriots erred, shall we say that they were in the wrong? No, by the shades of *Washington* and *Greene*, it may be said, they did not err, they were not in the wrong! At this moment of our contest with the *same foe*, for the freedom of the seas, shall we say that we erred in the principle of our resistance? A principle supported even in the *British* parliament, by the highest power of law, and talent of eloquence! The natural rights of man, and the immutable laws of nature, are all with that people. A power resulting from a *trust arbitrarily* exercised, may be lawfully resisted, whether the power is lodged in a collective body or in a single person, in the few

1812.

M'CLURG
v.
Ross.

or the many, said Lord *Camden* in the house of lords. How-
ever modified, it makes no difference. Whenever the trust is
wrested to the injury of the people, whenever oppression be-
gins, all is unlawful and unjust, and resistance of right be-
comes lawful and just. If the principle is the same, shall we
say that the cause of *Ireland* is bad, or suffer it by implication,
to be inferred from our adjudication? Shall we say that it was
less than slander to have deserted this association, and to
have run away with the money of United *Irishmen*, and to
have appropriated it to his own use in this country, and in
so doing to have been guilty of felony, which *inuendo* the
jury have found? And it is peculiarly the province of the jury
to determine with what intention any act is done. 2 *East's
Crown Law*, 685.

I am of opinion, therefore, to reverse the judgment.

Judgment affirmed.