## ADIAL P. BARNES *vs.* THE STATE OF MARYLAND.

*Criminal Libel—Sufficiency of Indictment—Averments of the Inducement—Office of the Innuendo.*

The office of the innuendo in an indictment for libel is to explain the words of the libel and to annex to them their proper meaning. It cannot introduce new matter or enlarge the natural import of the words. It is for the Court to determine whether a publication is susceptible of the meaning ascribed to it by the innuendo, and for the jury to find whether such meaning is truly ascribed to it.

The statements of an inducement and *colloquium* must be established by evidence, but the innuendo cannot be proved.

An indictment for libel on J. P. M., mayor of Snow Hill, charged that the defendant published in a newspaper an article stating that in September, 1897, a repetition was contemplated of some " monkey business " at the approaching election; that the henchmen who engaged in this business at the last election (that of 1896) received their authority from the mayor of Snow Hill; that the special policemen whom the mayor was authorized by statute to appoint, could, as they did at the last election, drive away voters from the polls, etc. There was no averment as to the meaning of the words " monkey business " and none that the conduct of the special policemen was the " monkey business " referred to, or that they were the henchmen referred to. The innuendo was: " meaning that the said J. P. M., Mayor, etc.,

illegally, knowingly, willingly, corruptly and purposely did appoint and arm a certain number of special policemen of his own selection, and prescribed their duties, and that the special policemen appointed and armed as aforesaid, did, at the last election in Snow Hill, on November 3rd, 1896, go around the polls and by threats and menaces, intimidate and terrorize the voters and drive them away in obedience to the duties prescribed by said " J. P. M., etc. Upon demurrer to the indictment, *Held:*

1st. That as there is no averment of extrinsic facts by which the meaning of the term " monkey business " can be ascertained, and no inducement showing that the henchmen and the special policemen were the same persons, there is nothing on the face of the indictment to connect the authority received by the former with the acts done by the latter, and there is consequently no warrant for the innuendo which alleges that the acts of the latter were done under the authority received by the former, and the demurrer should be sustained.

2d. That since it is not alleged that J. P. M. was mayor of Snow Hill in 1896 when the alleged " monkey business " was done, or that he appointed the special policemen, etc., or had any connection with their acts, it cannot be inferred from the innuendo that he was mayor in 1896.

Appeal from the Circuit Court for Somerset County.

The cause was argued before McSHERRY, C. J., BRYAN, FOWLER, BRISCOE, ROBERTS, BOYD and PEARCE, JJ.

*Thomas S. Hodson* (with whom was *H. Fillmore Lankford* and *James E. Ellegood* on the brief), for the appellant.

*Harry M. Clabaugh, Attorney-General,* and *Robley D. Jones, State's Attorney for Worcester County,* for the appellee.

McSHERRY, C. J., delivered the opinion of the Court.

This is an indictment for libel. The traverser inter-
posed a demurrer which was overruled. He then
pleaded not guilty and during the progress of the trial
which followed and which resulted in a verdict of guilty,
he took three exceptions to rulings of the Circuit Court
on questions relating to the admissibility of evidence.

The indictment contains no inducement or prefatory
averments except that the traverser is the editor and
proprietor of the " Worcester Advocate," a newspaper
published and circulated in Worcester county, and that
John P. Moore was mayor of Snow Hill in September,
eighteen hundred and ninety-seven. There is no suffi-
cient *colloquium.* The indictment quotes as the libellous
matter an article printed in the newspaper conducted by
Mr. Barnes. This article reads as follows: " We have
been informed that it is the intention of the Democratic
bosses to renew the ' monkey ' business again at the
polls in Snow Hill district at the next election. We
have also been informed that the Democratic henchmen
who participated in this business at the last election,
received their authority for so doing from the Mayor of
Snow Hill (meaning the said John P. Moore) under
section 15 of the Act of 1894, chapter 455, incorporating
Snow Hill. This section is as follows: ' And be it
enacted, That the night watchman before entering upon
his duties shall subscribe to an oath for the faithful per-
formance of his duties; he shall be vested with all the
police powers of constables; any one resisting him in
the discharge of his duties shall be liable, upon con-
viction, to punishment in the same manner and to the
same extent as if he had resisted a constable; the Mayor
shall have power to appoint special police for a term not
exceeding forty-eight hours, when he deems it necessary
for the peace and good order of the town and to pre-
scribe their duties and to fix their compensation.' It is
the latter part of the above section to which we wish to
call the especial attention of our readers. It will be
observed that by this clause of the section the Mayor is
clothed with extraordinary powers and can, in the least

outbreak of violence, which may be purposely provoked, appoint and arm any number of special policemen of his own selection and prescribe their duties.   These special policemen, as they did at the last election, can go around the polls and by threats and menaces intimidate and terrorize the voters and drive them away." The *innuendo* is stated thus: " meaning that the said John P. Moore, Mayor as aforesaid, illegally, knowingly, willingly, corruptly and purposely did appoint and arm a certain number of special policemen of his own selection, and prescribe their duties, and that the special policemen appointed and armed as aforesaid, did, at the last election in Worcester county, at the polls in Snow Hill, on the third day of November, in the year eighteen hundred and ninety-six, go around the polls and by threats and menaces intimidate and terrorize the voters and drove them away, in obedience to the duties prescribed by the said John P. Moore, Mayor as aforesaid, to the great injury, etc."

There is no difficulty in determining what publications constitute criminal libel.  Legitimate criticism of the acts and the conduct of public officers by the press is not only permissible, but under a government like ours, where the public officer is in theory, and ought to be in fact, the public's servant, it is one of the most effective methods to secure fidelity and to prevent abuses on the part of those entrusted with authority.  But whilst this lawful liberty of the press should not be restricted or abridged, it should not, on the other hand, be permitted to overstep its proper limits or be allowed to degenerate into wanton vituperation.  By such a degeneracy the usefulness and the influence of the press would soon be destroyed and serious injury would be inflicted on unoffending individuals.  Any publication, printed or written, which falsely and maliciously imputes to another the commission of a crime, or which exposes him to ridicule, contumely or contempt; or which reflects upon his character or tends to vilify him or diminishes his reputation or detracts from his character as a man of good morals, or alters his situation in society for the

worse, is an indictable libel.    It is not necessary that the
individual who is assailed should be named in the libel-
lous article.    If he is described in such a way as to be
identified, that is sufficient.    But it *is* necessary that the
language employed—if the libel consists of printed or
written words—should be sufficiently explicit, either in
itself or when taken in connection with the inducement
and the *colloquium,* to warrant the interpretation placed
upon it by the *innuendo.*    The office of the *innuendo* is
to explain the words of the libel and to annex to them
their proper meaning.    It cannot introduce new matter,
or enlarge the natural import of the words.    It is for
the Court to determine whether a publication is suscep-
tible of the meaning ascribed to it by the *innuendo,* and
for the jury to find whether such meaning is truly
ascribed to it.    *Avirett* v. *The State,* 76 Md. 521.    In
*Van Vechten* v. *Hopkins,* 5 Johns. 211, quoted with ap-
proval in *Peterson* v. *Sentman,* 37 Md. 154, it was said:
" The use in pleading an *averment* is to ascertain *that* to
the Court, which is generally or doubtfully expressed;
so that the Court may not be perplexed *of whom* or *of
what,* it ought to be understood; and to *add* matter to
the plea to make doubtful things clear.    A *colloquium*
serves to show that the words were spoken in reference
to the matter of the averment.    An *innuendo* is explana-
tory of the subject-matter sufficiently expressed before;
and is explanatory of such matter only, for it cannot
extend the sense of the words beyond their own mean-
ing, unless something is put upon the record for it to
explain.    This may be illustrated by *Barham's case,* 4
Coke's Rep. 20.    Barham brought an action for the
defendant's saying of him, ' Barham burnt my barn '
(*innuendo*) ' a barn with corn.'    The action was held not
to lie; because burning a barn, unless it had corn in it,
was not felony.    ' But,' says DE GREY, CH. J. in *Rex* v.
*Home* (Cowp. 184), ' if, in the introduction, it had been
averred that the defendant had a barn full of corn burnt,
and that in a discourse about that barn, the defendant
had spoken the words charged in the declaration, an
*innuendo* of its being the barn full of corn would have

been good; for by coupling the *innuendo* in the libel with the introductory averment, it would have been complete.' Here the extrinsic fact that the defendant had a barn full of corn, is the *averment*. The allegation that the words were uttered in a conversation in reference to that barn, is the *colloquium;* and the explanation given to the words thus spoken, is the *innuendo*."

The article set out in the indictment now before us states, first, that there was in September, eighteen hundred and ninety-seven, a contemplated repetition of some " monkey business " at the then approaching election, without any averment whatever from which the meaning of the phrase " monkey business " can be ascertained. The article then proceeds to charge that the " henchmen " who engaged in that business during the preceding election—that is the election of eighteen hundred and ninety-six—received their authority for so doing from the mayor of Snow Hill under the charter of the town. Secondly, the article states that the special policemen whom the mayor was empowered to appoint, could, as they did at the election in eighteen hundred and ninety-six, by threats drive the voters from the polls. Whether this conduct of the special policemen is the " monkey business " in which the henchmen participated the year before is left wholly to speculation and conjecture. There is no averment of any sort in the indictment to connect the one with the other; and it is perfectly obvious that the *innuendo* cannot supply such an omission.

There is no prefatory averment to show that the Democratic henchmen who, it is alleged, received from the mayor their authority for engaging in the " monkey business " mentioned in the first sentences of the article, were the special policemen who, it is charged, unlawfully drove voters from the polls. A henchman is not, according to the ordinary meaning of the word, a policeman. The word signifies servant, page or a hanger on. If the henchmen and the special policemen were not the same persons, then there is no sort of relation between the authority which the henchmen received and the

unlawful acts imputed to the policemen; and if no such relation existed the *innuendo*, alleging that the acts of the latter were amongst the duties prescribed by the mayor under the authority given to the henchmen, introduces entirely new matter instead of merely defining or pointing out the meaning of the words which were actually used. There being no inducement to show that henchmen and special policemen were identical, it is incompetent, upon demurrer to the sufficiency of the indictment, to infer that they were. As, then, there is no averment of extrinsic facts by a reference to which the meaning of the term " monkey business " can be ascertained; and as there is no inducement showing that the henchmen and the special policemen were the same persons, there is nothing on the face of the indictment to connect the authority received by the former with the acts done by the latter; and there is, consequently, no warrant for the *innuendo* which alleges that the acts of the latter were done under the authority received by the former.

. The alleged libellous article does not mention by name the individual aimed at, but identifies him merely by description; and he is described as the mayor of Snow Hill. It is not averred in the indictment that John P. Moore was mayor of Snow Hill in eighteen hundred and ninety-six—the year when the " monkey business " is alleged to have been done. It is not averred that *he* appointed the henchmen, that these henchmen received their authority from *him*, or that *he* defined their duties, or that *he* armed them. Nor is there any averment that *he*, John P. Moore, had any connection whatever with the selection of the special policemen in eighteen hundred and ninety-six. To bring John P. Moore within the description " Mayor of Snow Hill " and to impute to *him* the wrongful and illegal acts charged as having been done by the *mayor*, it is absolutely essential that the indictment should show by an appropriate inducement that *he, John P. Moore,* was the person who was the mayor of Snow Hill in eighteen hundred and *ninety-six when* these wrongful and illegal acts were done. In no

other way could it possibly appear that *John P. Moore* was the individual assailed by the article. It cannot be inferred that because he was mayor in 1897 he was also mayor in 1896. There should have been an averment that John P. Moore was mayor of Snow Hill in *1896*, that as mayor he appointed the henchmen, that these henchmen were in fact the same persons afterwards spoken of as special policemen; that *he* in 1896 defined their duties; and there should have been a *colloquium* stating that in relation to *him,* John P. Moore, as mayor in 1896 and in reference to the appointment by him *at that time* of the special policemen the article was published by the traverser. With such appropriate averments and a suitable *colloquium,* the *innuendo* pointing out the meaning of the words in their relation to the extrinsic facts would have made the indictment legally sufficient. An *innuendo* cannot be proved; the statements of an *inducement* and a *colloquium* must be established by evidence. Nothing, therefore, which *must* be proved can be set forth in the *innuendo.* Apart from the *innuendo* there is not a suggestion that John P. Moore was mayor of Snow Hill in 1896; and consequently he is not, on the face of the indictment, within the scope or terms of the published article.

Doubtless the learned Judge who ruled upon the demurrer below did not scrutinize the indictment before him, but assumed that it contained the necessary averments to give it validity. This we gather from his opinion in the record. He seems simply to have construed the article upon the theory that the indictment was technically accurate. Had there been the proper averments the indictment would not have been open to an attack by a demurrer.

Because of the defects which we have pointed out, we hold the indictment to be bad. The demurrer ought to have been sustained. This being so, the verdict of guilty and the judgment thereon were erroneous, and the judgment must be reversed.

*Judgment reversed with costs.*

(Decided November 16th, 1898.)