# WARNER *v.* BAKER.

---

EVIDENCE; TRIAL; REVERSIBLE ERROR; SLANDER AND LIBEL; OBJECTIONS AND EXCEPTIONS; APPEAL AND ERROR.

1. The admission of evidence relating to a collateral matter, and introducing through the cross-examination of the defendant an issue not directly involved in the case, by means of which evidence the defendant's integrity is impeached, is reversible and prejudicial error.

2. Words that are not in themselves objectionable cannot be made so by innuendo, but must be aided by proper averment and colloquium.

3. The innuendo in an action of libel cannot extend the sense of the alleged libelous words beyond their own natural meaning, unless something is put upon the record to which the words spoken may be referred, and by which they may be explained by the innuendo.

4. In the declaration in an action of libel, it is the office of the inducement to narrate the extrinsic circumstances which, coupled with the language published, affects its construction and renders it actionable, where, standing alone, and not thus explained, the language would appear either not to concern the plaintiff, or, if concerning him, not to affect him injuriously.

5. The colloquium in the declaration in an action of libel is a direct allegation that the language used was concerning the plaintiff, or referred to him and his affairs, or related to plaintiff and the facts alleged as inducement.

6. No colloquium or averment of extraneous matter is necessary where the publication is libelous upon its face. If, however, the words are not defamatory *per se*, the defamatory meaning must be set out in the inducement, and this meaning or application must appear by proper averment in the colloquium. Where the person alleged to have been defamed is alluded to in ambiguous terms, full and ex-

plicit averment is essential to show the application of the language used. The extrinsic facts must be separately and distinctly alleged as traversable facts.

7. If words are actionable *per se*, no innuendo is required in the declaration in an action for their publication; but, if the words used do not import libelous or slanderous defamation on their face, their meaning must be made to appear by innuendo.

8. A newspaper publication by the candidate for a public office, calling attention to a conference held between his adversaries and the United States district attorney, to determine "what ammunition was needed to defeat" the candidate, asking where the money came from in the contest against the candidate, and ending, "How about the race track?" is not libelous *per se* of the district attorney; and in an action by him against the candidate for libel, where there is nothing in the declaration except in the innuendo to indicate that the words published had reference to the failure of the plaintiff to prosecute race-track gamblers, or to his illegally or corruptly obtaining money from them in consideration of the nonperformance of his official duty, the declaration is fatally defective, and it is error for the trial court to overrule a motion by the defendant to arrest a judgment in favor of the plaintiff.

9. The testimony of the defendant in a libel suit, to explain the meaning he intended to convey by the words used in the alleged libelous publication, is admissible to determine whether the meaning ascribed to it by the innuendo in the declaration is correct.

10. It is for the court to determine whether an alleged libelous publication is susceptible of the meaning ascribed to it by the innuendo, and for the jury to determine whether such meaning is truly ascribed to it.

11. Where alleged libelous words are not libelous *per se*, it is error for the trial court to take from the jury the consideration of the meaning to be attached to such words; and under such circumstances, where the defendant has testified as to what he meant by the words, it is error for the trial court to withdraw from the jury the consideration of his testimony.

12. Where alleged libelous words are ambiguous and susceptible of two meanings, one libelous and the other not, it is for the jury to decide in what sense they were actually used.

13. It is not necessary for a party making a motion in arrest of judgment on the ground that the declaration fails to state a cause of action, to reserve an exception to the action of the trial court in overruling his motion. (Distinguishing *Smith* v. *Ross*, 31 App. D. C. 348.)

14. The question of the validity of a judgment in which the declaration

fails to state a cause of action may be raised in the first instance in the appellate court by writ of error, without demurrer, motion in arrest, or other proceeding below.

No. 2102. Submitted January 6, 1911. Decided March 6, 1911.

HEARING on an appeal by the defendant from a judgment of the Supreme Court of the District of Columbia, on verdict, in an action of libel. *Reversed.*

The COURT in the opinion stated the facts as follows:

This is an appeal from the judgment of the supreme court of the District of Columbia in an action of libel, in which the appellant, Brainerd H. Warner, was defendant. For convenience, the appellant will be referred to hereafter as defendant, and appellee, Daniel W. Baker, as plaintiff. The alleged libel consisted of an article published by defendant in the Washington· Herald of March 28, 1908. It is claimed that it in substance charged plaintiff with the crime of receiving money for political purposes in consideration of his refraining from prosecuting alleged violations of the gaming act of the District of Columbia.

The declaration is in two counts, which differ only in the innuendo. In each count it is averred in the inducement and colloquium that the plaintiff, at the time of the publication of the alleged libelous article, and prior thereto, was the United States district attorney for the District of Columbia, charged with the duty of prosecuting violations of law within said District, and that, at the time the article was published, horse races were in progress on the grounds of the Washington Jockey Club, at which bets or wagers were being made upon the results of the races. Plaintiff's failure to proceed criminally against the race-track gamblers is explained in the declaration by the fact that prior thereto he had prosecuted one John Walters upon the charge of setting up a gaming table at the said race course, in which cause a demurrer to the indictment had been sustained by the supreme court of the District of Co-

lumbia, from which decision plaintiff was prosecuting an appeal in this court; and that, inasmuch as the law had been judicially construed, he had decided not to issue warrants or make presentments to the grand jury in other cases, pending the determination of the appeal.

It is further alleged that the defendant was a candidate for the Republican nomination to Congress from the sixth congressional district of Maryland, and had engaged space in the Washington Herald, in which he was daily publishing matter relating to his campaign. It was in this space that the article in question appeared. It is set out in the declaration as follows:

Warner's Political Contest.

(Meaning thereby the contest of said defendant, Brainerd H. Warner, for said nomination for the office of Representative in the Congress of the United States from the sixth congressional district of Maryland, aforesaid.)

Col. Pearre (meaning thereby Honorable George A. Pearre, a Representative in the sixtieth Congress of the United States from the sixth congressional district of Maryland) said in his great onslaught on Mr. Warner (meaning the defendant), Brainerd H. Warner), a few days ago:

"I regard his candidacy as a joke. If I had a monkey and hand-organ, I could get up a crowd anywhere."

This was a fine expression for a statesman (meaning said Pearre), but not wanting in dignity so much as a justice of the supreme court of the District of Columbia (meaning thereby the Honorable Ashley M. Gould, associate justice of the supreme court of the District of Columbia), who, with the United States district attorney (meaning the plaintiff), went to Rockville (meaning the town of Rockville, county of Montgomery, State of Maryland) last Satudray (meaning Saturday, the 21st day of March, A. D. 1908) to attend a conference of Mr. Warner's (meaning defendant, Brainerd H. Warner) enemies, and determine what ammunition was needed to defeat him.

The question now is, Where does the money come from in

the contest against Mr. Warner? (Meaning the defendant, Brainerd H. Warner.)

How about the race track?

Lawyer.

It is alleged that the Washington Herald had a large circulation in the District of Columbia and elsewhere in the United States and foreign countries; that defendant published said article maliciously, contriving to injure plaintiff in his good name, fame, and credit, and to bring scorn, public scandal, infamy, and disgrace upon him, and to injure him in his office as United States attorney. This, in substance, comprises the inducement and colloquium of each of the two counts.

To the first count an innuendo is added interpreting the article, and charging defendant with meaning thereby and intending to convey, and actually conveying, that the said plaintiff entered into a conference with certain persons at Rockville for the purpose of determining in what way sufficient funds could be raised to conduct the campaign on behalf of said Pearre against the defendant, and meaning thereby that plaintiff was obtaining money or funds for that purpose from the Washington Jockey Club or persons making wagers at the race track, and meaning and tending to convey the idea that plaintiff was corrupt in the conduct of his office in not prosecuting such persons, in consideration of money being furnished for use in said political campaign. It is also alleged that defendant, by means of the article, meant and intended to charge plaintiff with being corrupt in the performance of his official duties, and that, as a result, plaintiff had been greatly injured and damaged in his good name, fame, and reputation.

The innuendo to the second count simply alleges that, by the publication, defendant meant and intended to charge that the plaintiff was acting corruptly in the performance of his official duties; that he was being influenced in the discharge thereof by the contribution of money by persons interested in gambling at said race track; and that the money so contributed was being used against the defendant's candidacy for Congress.

Then followed the usual averment of injury and damage. The cause was tried to a jury, and a verdict returned for plaintiff. From the judgment thereon, the case comes here on appeal.

*Mr. J. J. Darlington* and *Mr. W. C. Sullivan* for the appellant.

*Mr. Henry E. Davis* and *Mr. Frank J. Hogan* for the appellee.

Mr. Justice VAN ORSDEL delivered the opinion of the Court:

In the course of the trial, defendant testified, among other things, that the article in fact was intended as a criticism upon plaintiff's going into the State of Maryland to engage in politics in violation of the civil service regulations of the United States. On cross-examination, for the purpose of showing malice, he was interrogated in respect of certain communications addressed by him to the Attorney General of the United States, for the purpose of securing, if possible, the discharge of plaintiff from his office. Defendant was also asked, over objection of his counsel, whether he had not sought the aid of one Kroll, a civil service employee of the government, to assist him in his campaign for Congress, which he positively denied. Kroll was offered as a witness in rebuttal, to contradict the above denial of defendant. He was permitted, over objection, to testify that defendant had sought his aid in conducting his campaign.

In any view of the case, the admission of this evidence was reversible error. It related to a collateral transaction, and introduced, through the cross-examination of defendant, an issue not directly involved in the case. Nothing that defendant had testified to justified reference to this incident on cross-examination. The test of its admissibility in the way in which it was offered is whether or not plaintiff would have been entitled to prove, as part of his case in chief, that defendant had attempted to employ Kroll. The application of this test clearly suggests

the error.   That the evidence was highly prejudicial to defendant is apparent, in that his integrity was thus impeached, and the jury improperly permitted to consider it in reaching the verdict.

The chief ground of attack by counsel for defendant relates to the action of the court below in denying a motion in arrest of judgment.   Defendant alleged in the motion that the judgment should be arrested for the reason that in neither the inducement nor the colloquium of the declaration is it alleged that the words complained of referred to the unlawful obtaining of money by plaintiff in his official capacity from the race-track gamblers for the purpose of conducting a campaign against defendant, or for any other purpose, in consideration of which plaintiff agreed to refrain, or did refrain, from prosecuting the gamblers, or from performing any of his official duties.   Nowhere in the declaration does the equivalent of the above allegation appear, except indirectly in the innuendo.   This is not sufficient, unless the words themselves contain the charge.

Counsel for plaintiff seem to have proceeded upon the theory that the words spoken were sufficient to sustain the legal inference of the above charge.   It is essential, therefore, to consider whether the words used are in themselves actionable.   While the rule is somewhat indefinite, we find a safe one in *Brooker* v. *Coffin,* 5 Johns. 188, 4 Am. Dec. 337, and one fully supported by the cases.   "In case the charge, if true, will subject the party charged to an indictment for a crime involving moral turpitude, or subject him to an infamous punishment, then the words will be in themselves actionable."   Measured by this test, the words used in the publication are not in themselves actionable.   They will admit of an interpretation which amounts to nothing more than a permissible criticism of the conduct of plaintiff in his official capacity.   Even considering, in connection with the motion in arrest, the public agitation over race-track gambling and the general criticism of plaintiff's conduct in connection therewith, the article, standing alone, may well be interpreted as a criticism upon plaintiff's neglect of duty in leaving his official jurisdiction and going into the State of Mary-

land to engage in a political contest, when he ought to have
been prosecuting the race-track gamblers, or a criticism upon
the impropriety of a public official engaging in a political con-
test in violation of the civil service regulations of the govern-
ment.    The inquiry as to where the money was to come from
might naturally arise from the fact that a political campaign
was in progress.    The article is as clearly susceptible of this
interpretation as of the inference that plaintiff was corruptly
refraining from prosecuting the race-track gamblers in con-
sideration of their furnishing the money with which to conduct
the campaign against defendant.

It is true that the declaration contains the following state-
ment: "Which said false, scandalous, malicious, and defama-
tory libel was composed and published, and caused and pro-
cured to be composed and published, as aforesaid, by the said
defendant, of and concerning the said plaintiff, said defendant
meaning and intending thereby to charge that the said plaintiff
was a corrupt, dishonest, and unworthy person, and was being
influenced in the discharge of his duties as United States at-
torney for the District of Columbia by the fact that some per-
son or persons or company, interested in said race track or
course, or in the contests thereon, or in having betting, wager-
ing, and gambling permitted thereon, was contributing money
to be used against the candidacy of the said defendant, Brain-
erd H. Warner, for the office of Representative in the Congress
of the United States, as aforesaid, by means of which said false
and scandalous libel the plaintiff has been and is very greatly
injured in his good name, fame, and reputation, and brought
into scorn, scandal, infamy, and disgrace, insomuch as divers
good and lawful citizens have, by reason of the grievance afore-
said, suspected and believed, and still do suspect and believe,
the plaintiff to be guilty of the acts set out and charged, and
intended to be charged, in said publication, and to have been
guilty of bad and improper conduct so charged of and concern-
ing him, and have, by reason of the committing of said griev-
ance, from hence until now, believed the plaintiff to be a dis-
honest and unworthy person, and to have been guilty of the

wrong alleged of him as the United States attorney for the District of Columbia, aforesaid."

This is only plaintiff's interpretation by way of innuendo of the meaning of the words used in the alleged libelous article. It is far from a direct averment that defendant, by the language used, and from the logical meaning thereof, as set forth in the innuendo, charged the plaintiff with corruptly receiving money from the race-track gamblers, to be used in the campaign against defendant. In fact, counsel admit as much in their brief, where they say: "Assuming the existence of the facts set forth in the declaration, the article in question is, we respectfully submit, libelous *per se."* Counsel for plaintiff and the court below have acted throughout this entire proceeding upon the mistaken assumption that the article complained of is *ex vi termini* actionable.

The innuendo is only essential to explain the meaning of the words used. It is well settled that words that are not in themselves actionable cannot be made so by innuendo, but must be aided by proper averment and colloquium. "The office of an innuendo is often mistaken by pleaders. It cannot extend the sense of the words spoken, beyond their own natural meaning, unless something is put upon the record, to which the words spoken may be referred, and by which they may be explained by the innuendo." *McCuen* v. *Ludlum,* 17 N. J. L. 12.

It is the office of the inducement "to narrate the extrinsic circumstances which, coupled with the language published, affects its construction, and renders it actionable; where, standing alone and not thus explained, the language would appear either not to concern the plaintiff, or, if concerning him, not to affect him injuriously." Townshend, Slander & Libel, 3d ed. sec. 308. The colloquium is a direct allegation that the language used was concerning the plaintiff, or referred to him and his affairs, or related to plaintiff and the facts alleged as inducement.

As before suggested, nowhere in the inducement or colloquium is there any averment to the effect that the words published had any reference to the nonprosecution of the race-track

gamblers, or to the illegal or improper obtaining of money from them by reason of such nonprosecution or nonperformance of official duty or that the words published charged plaintiff with the crime of corruptly withholding the prosecution of the race-track gamblers in consideration of their furnishing money, either to him, or for the purpose of conducting the campaign against defendant.

Whether or not the charges imputed the commission of a crime by plaintiff was a question of fact for the jury; but the jury was powerless to determine this issue unless it appeared upon the record, and it could only appear by a proper averment in the declaration. The rule anounnced in England in *Rex* v. *Horne,* decided in the House of Lords, and reported in Cowp. pt. 2, p. 672, has been generally adopted in this country. Lord Chief Justice de Grey said: "As to the matter to be charged, whatever circumstances are necessary to constitute the crime imputed must be set out; and all beyond are surplusage. * * * Where the circumstances go to constitute a crime, they must be set out. Where the crime is a crime independently of such circumstances, they may aggravate, but do not contribute to make, the offense. * * * But, if the terms of the writing are general, or ironical, or spoken by way of allusion or reference, although every man who reads such a writing may put the same construction upon it, it is by understanding something not expressed in direct words, and it being a matter of crime, and the party liable to be punished for it, there wants something more. It ought to receive a judicial sense, whether the application is just; and the fact, or the nature of the fact, on which that depends, is to be determined by a jury. But a jury cannot take cognizance of it unless it appears upon the record; which it cannot do without an averment."

In *Pollard* v. *Lyon,* 91 U. S. 225, 23 L. ed. 308, the court said: "When words are set forth as having been spoken by the defendant of the plaintiff, the first question is whether they impute a charge of felony or any other infamous crime punishable by law. If they do, an innuendo, undertaking to state the same in other words, is useless and superfluous; and, if they do

not, an innuendo cannot aid the averment, as it is a clear rule
of law that an innuendo cannot introduce a meaning to the
words broader than that which the words naturally bear, unless
connected with proper introductory averments. *Alexander* v.
*Angle,* 1 Cromp. & J. 143; 1 Tyrw. 9; *Goldstein* v. *Foss,* 2
Younge & J. 146, 4 Bing. 489, 1 Moore & P. 402, 29 Revised
Rep. 610; *Carter* v. *Andrews,* 16 Pick. 5; *Beardsley* v. *Tap-
pan,* 5 Blatchf. 497, Fed. Cas. No. 1,189." In this opinion
the court approved the rule announced in certain leading Penn-
sylvania cases, "that words spoken of a private person are only
actionable when they contain a plain imputation, not merely of
some indictable offense, but one of an infamous character, or
subject to an infamous or disgraceful punishment; and that an
innuendo cannot alter, enlarge, or extend their natural and
obvious meaning, but only explain something already sufficiently
averred, or make a more explicit application of that which
might otherwise be considered ambiguous, to the material sub-
ject-matter properly on the record, by the way of averment or
colloquium. *Gosling* v. *Morgan,* 32 Pa. 275; *Shaffer* v. *Kint-
zer,* 1 Binn. 537, 2 Am. Dec. 488; *M'Clurg* v. *Ross,* 5 Binn.
218; *Andres* v. *Koppenheafer,* 3 Serg. & R. 255, 8 Am. Dec.
647.

The futility of the pleader's attempt to embrace the neces-
sary averment in the innuendo, where the words are not in
themselves actionable, is well expressed by Chief Justice Shaw
in *Carter* v. *Andrews,* 16 Pick. 1, where an auctioneer at the
public sale of a library used the following words: "We offer
these books under a disadvantage; for the library has been plun-
dered by Deacon James G. Carter, of this town." In holding
these words not slanderous *per se,* and referring to the insuf-
ficiency of the declaration, the learned chief justice said: "If
the words have the slanderous meaning alleged, not by their own
intrinsic force, but by reason of the existence of some extrane-
ous fact, the plaintiff must undertake to prove that fact, and
the defendant must be at liberty to disprove it. The fact then
must be averred in a traversable form, with a proper col-
loquium; to wit, an averment that the words in question, are

spoken of and concerning such usage, or report, or fact, whatever it is, which gives to words otherwise indifferent, the particular defamatory meaning imputed to them.   Then the word, 'meaning,' or 'innuendo,' is used with great propriety and effect, in connecting the matters thus introduced by averment and colloquia, with the particular words laid, showing their identity, and drawing what is now the legal inference from the whole declaration, including the averments and colloquia, that such was, under the circumstances *thus set out,* the meaning of the words used.   These rules are necessary to bring the case of slander within the well-known rules of pleading, which require that a declaration shall contain enough to give notice to the defendant, of all the material facts intended to be proved, and to enable the court to perceive *from the record,* that a good title is set out by the plaintiff, to enable him to have a judgment."

It follows that no colloquium or averment of extraneous matter is necessary where the publication is libelous upon its face. If, however, the words are not defamatory *per se,* the defamatory meaning must be set out in the inducement, and this meaning or application must appear by proper averment in the colloquium.   Where the person alleged to have been defamed, as in the present case, is alluded to in ambiguous terms, full and explicit averment is essential to show the application of the language used.   The extrinsic facts must be separately and distinctly alleged as traversable facts.

If words are actionable *per se,* no innuendo is required.   But if the words used do not import libelous or slanderous defamation on their face, their meaning must be made to appear by innuendo.   The innuendo refers to matter already expressed, and explains the meaning of the words used, and to designate the name of the person alleged to have been libeled, when referred to in ambiguous terms.   It therefore adds nothing to the natural meaning and sense of the language used, except to connect the language employed with the extrinsic facts averred.

Applying this universal rule, a mere glance is sufficient to reveal how far the language used in the article before us fails on its face, without the intervention both of proper averment

and innuendo, to impute to plaintiff the meaning here sought to be placed upon it. Tested by this rule, it will be found that nothing is contained in the declaration, except in the innuendo, to indicate even remotely that the words published had reference to the failure of plaintiff to prosecute the race-track gamblers, or to his illegally and corruptly obtaining money from them in consideration of the nonperformance of his official duty. This is not alleged in the publication itself, and must appear by proper averment in the declaration. Since it does not so appear, the declaration must be held to be fatally defective.

The defendant was permitted in the course of the trial to testify to what he meant, or had reference to, by the words used in the article of March 28th. He testified "that the reference in it to Col. Pearre's statement in regard to a monkey and a hand-organ was for the purpose of showing what the defendant considered a very undignified proceeding on the part of a candidate for Congress; that his second reference in the article was the statement of an objection by him to the action of the United States district attorney in going outside of the District for which he was appointed, to indulge in political conferences, and lowering the dignity of a Presidential appointment, which was quasi judicial, in the estimation of the defendant, and which by time-honored custom excluded this sort of petty participation in politics; that the clause of the article, 'to determine what ammunition was needed to defeat Warner,' was an explanation to the readers to show why they went there, the defendant having information that the district attorney acted as floor manager at that conference, and asked the representatives from the different districts how much money and what other means were necessary to defeat the defendant, the representatives being called up one by one, and sent out into the hall to get the necessary ammunition, there being in that room at that time, in violation of the spirit of the civil service, several postmasters, one employee at least of a department of the government, and a United States district attorney, which circumstance the defendant put up for the consideration of the readers of the paper, as being what he considered improper conduct; that

the reference in the article to where the money came from in
the contest against the defendant was because the witness
wished to know that,—it had been alleged that he had circu-
lated money through the county, and he wanted to know where
this money was coming from,—whether from these govern-
ment employees, or whether it was given by Mr. Pearre or by
Mr. Blair; and that with respect to the concluding paragraph
of the article, 'How about the race track?' the defendant had
no idea or thought of libeling the plaintiff, that he did not con-
sider that he or any other officer in his position would be fool
enough to reach out his hand and take money from the race
track for any political or campaign purposes; that the air had
been full of this race-track business for a long time past; de-
fendant's attention had been called to it; he had, himself, en-
deavored to aid in breaking up the race track and pool selling;
that objections to it were coming from every class of the com-
munity,—from mothers, fathers, teachers, preachers,—and it
all centered, whether justly or not, on the office of the United
States district attorney; that the defendant had no personal
feeling against the plaintiff, but thought he was wrong in go-
ing to that conference and lowering the dignity of the office,
and that he was wrong in not making any response to this pub-
lic clamor, coming, not only from citizens, but from the com-
missioners, and that he ought to have remained at home and
given the very closest attention to the suppression of that evil."

    The testimony of a defendant to explain to the jury the mean-
ing he intended to convey by the words used in an alleged libel-
ous article is essential to determine whether the meaning as-
cribed to it by the innuendo is correct.    "It is for the court to
determine whether a publication is susceptible of the meaning
ascribed to it by the innuendo, and for the jury to find whether
such meaning is truly ascribed to it."    Barnes v. State, 88 Md.
347, 41 Atl. 781.    His testimony was also proper on the ques-
tion of malice.    "The motives or purposes with which the words
were spoken lie at the very foundation of malice.    They are the
very conditions upon which exemplary or punitive damages are
predicated, and no good reason appears why defendant should

not be permitted to prove what his motives were." *Callahan* v. *Ingram,* 122 Mo. 355, 373, 43 Am. St. Rep. 583, 26 S. W. 1020. See also Odgers, Libel & Slander, 317; Townshend, Slander & Libel, § 91; *Bennett* v. *Smith,* 23 Hun, 50, 53; *Wilson* v. *Noonan,* 35 Wis. 321, 353, 361; *Wynne* v. *Parsons,* 57 Conn. 73, 81, 17 Atl. 362.

The effect of the defendant's testimony, however, was withdrawn from the jury by the first instruction given by the court at the request of plaintiff, which was as follows:

"If you find from the evidence that, at the time of the publication of the article described in the declaration, the following were facts, namely:

"(1) The plaintiff was United States attorney for the District of Columbia;

"(2) There was in said District a race track at which were being had races of horses;

"(3) At that track betting or making wagers on the results of said races was being carried on;

"(4) It was believed or claimed by some that the said betting or laying of wagers, or the permitting of the same, could be prevented by the prosecution in that behalf by the plaintiff, as such district attorney, of the persons engaged in or permitting the said betting or laying of wagers;

"(5) The plaintiff in fact did not prosecute the said persons or any of them;

"(6) The defendant was engaged in a contest in the county of Montgomery, State of Maryland, for nomination as a candidate for the office of Representative in the Congress of the United States from the congressional district embracing said county;

"(7) His opponent in said contest for such nomination was the certain Pearre, in the said article mentioned;

"(8) In the said contest the plaintiff supported the candidacy of the said Pearre, and opposed that of the defendant; and

"(9) The defendant wrote and procured the publication of the said article;

"Then you are instructed, as matter of law, that the said article is libelous, and that your verdict should be for the plaintiff; and that the only question for your determination is what amount of damages the plaintiff is entitled to recover of the defendant by reason of the publication of said article."

This instruction is clearly erroneous, because it takes from the jury the consideration of the meaning to be attached to the words used in the publication. It is based upon the mistaken assumption and interpretation of the court that the words used are libelous *per se*. In other words, to sustain this instruction, it must be held that, as matter of law, the words used mean, on their face, not only that the money to defeat defendant came from the race-track gamblers, but that the plaintiff was obtaining it corruptly in consideration of his refusal to prosecute them. These facts could not be properly adduced from the language of the article itself, but were matters for averment and proof. "The plaintiff must prove the *truth of the colloquium*, or the application of the words to himself, and to the extrinsic matters alleged in the declaration, where these are material to his right to recover." 2 Greenl. Ev. § 417.

The same error was committed by the court in giving plaintiff's second instruction, which was to the effect that, if the jury believed that defendant published the article, then upon that fact alone malice is presumed, and "plaintiff is entitled to recover compensation for the injury done to his reputation by the tendency of such publication to bring him into disgrace and disrepute," and for the mental suffering he endured. By this instruction, defendant's construction of the meaning he intended to convey by the words used, as touching both on the question of malice and injury to plaintiff's reputation, was withdrawn from the jury. These were purely questions of fact for the jury to determine from a consideration of all the evidence in the case.

It is unnecessary to consider the objections made to the other instructions of the court, and to the failure of the court to give certain instructions requested by the defendant, since the court's

charge is almost entirely based upon the erroneous assumption that the words complained of are libelous *per se.*

It may be accepted as settled law that where the words used are unambiguous and clearly libelous on their face, incapable of an innocent meaning, and there is no evidence in the case tending to change their natural meaning, it is the duty of the court in civil actions to instruct the jury that, as matter of law, they are libelous. But if the language is ambiguous and susceptible of two meanings, one libelous and the other not, it is for the jury to decide in what sense it was actually used. In the case at bar, the jury was not permitted, under the foregoing instructions, to determine the sense in which the language was used. The interpretation placed upon it by the plaintiff is exactly the reverse of that given it by defendant, and the right to say which was correct should have been left to the jury.

It is argued that no exception appears to have been taken to the denial of the motion in arrest of judgment, and therefore the question of the sufficiency of the declaration is not properly before us. In support of this contention our attention is directed to the case of *Rodriguez* v. *United States,* 198 U. S. 156, 49 L. ed. 994, 25 Sup. Ct. Rep. 617. In that case there was a motion in arrest of judgment, the motion being directed to a defect in drawing the grand jury. The court held that the question was not before it, inasmuch as no exception had been preserved to the ruling of the court denying the motion in arrest. In *Smith* v. *Ross,* 31 App. D. C. 348, where this court made a similar holding, the motion was directed to an alleged error of the court in removing the case from the stet calendar to the trial calendar. In these cases, the error was one that defendant might waive; and, in such cases, where no exception is taken to the ruling of the court, he will be deemed to have waived the objection.

In the case at bar, however, a different and broader question is presented. The declaration wholly fails to state a cause of action. In such a case, the defendant may avail himself of the defect, either by motion in arrest or on error in the appel-

late court. It is not such a defect as he will be deemed to have waived. In *Bank of United States* v. *Smith,* 11 Wheat. 171, 6 L. ed. 443, the court said: "The doctrine of the King's bench, in England, in the case of *Cort* v. *Birkbeck,* 1 Dougl. K. B. 218, that, upon a demurrer to evidence, the party cannot take advantage of any objections of the pleadings, does not apply. By a demurrer to the evidence, the court in which the cause is tried is substituted in the place of the jury. And the only question is whether the evidence is sufficient to maintain the issue. And the judgment of the court upon such evidence will stand in the place of the verdict of the jury. And, after that, the defendant may take advantage of defects in the declaration, by motion in arrest of judgment, or by writ of error." In *Reynolds* v. *Stockton,* 140 U. S. 254, 35 L. ed. 464, 11 Sup. Ct. Rep. 773, it was held that a judgment rendered, not responsive to the issue presented by the pleadings, may be assailed for the first time in an attempt to enforce the judgment in a sister State, notwithstanding the full-faith-and-credit clause of the Constitution. (U. S. Const. art. III., sec. 1.)

It may be suggested that this defect was called to the attention of plaintiff by motion in the court below, when he could have amended without delay, but he elected to stand upon his declaration. It was again presented by motion in arrest after judgment, but still he refused to avail himself of his rights. It is well settled that a defect of this character may be raised in the first instance in the appellate court by writ of error, without demurrer, motion in arrest, or other proceeding below. *Slacum* v. *Pomery,* 6 Cranch, 221, 3 L. ed. 205; *Cragin* v. *Lovell,* 109 U. S. 194, 27 L. ed. 903, 3 Sup. Ct. Rep. 132; *Western U. Teleg. Co.* v. *Sklar,* 61 C. C. A. 281, 126 Fed. 295; *Clement* v. *Fisher,* 7 Barn. & C. 459, 1 Mann. & R. 281, 6 L. J. K. B. 39.

The motion in arrest should have been granted. The judgment is reversed, with costs, and the cause remanded, with directions to arrest the judgment.            *Judgment arrested.*

A motion by the appellee to amend the judgment of this court,

and to allow a writ of error to the Supreme Court of the United States, was denied April 4, 1911. Thereafter judgment was entered by the court below upon the mandate of this court, and from such judgment the appellee prosecuted an appeal to this court (No. 2310). The judgment was affirmed and an application for an appeal to the Supreme Court was then allowed.